Richmond
MARGARET MARY LIMONJA
and RAYMOND JAMES BROOKS
v.
COMMONWEALTH OF VIRGINIA
No. 1230-86-2
Decided December 6, 1988

COUNSEL

Marvin D. Miller (Thomas L. Barney, on brief), for appellants.

Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLE, J.**—Margaret Mary Limonja and Raymond James Brooks were convicted in a bench trial of possession of cocaine with intent to distribute. On appeal, they contend that the seizure of their persons, the search of their car, and their extended detention violated rights guaranteed to them under the fourth and fourteenth amendments to the United States Constitution. We disagree and affirm.

I.

■ We review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it. *Martin v. Commonwealth,* 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)(citing Code § 8.01-680).

On November 17, 1985, Trooper Thomas C. Keith of the Virginia State Police was patrolling Interstate 95 in an unmarked vehicle near the Walthall exit. He observed the defendants traveling north in a car with a Florida license plate indicating that the vehicle was a rental car from Dade County. His suspicions aroused, Trooper Keith attempted to run a license check, but all of the computers in Florida were down. At this time, Keith radioed for a narcotics dog and a backup.

Soon thereafter, the defendants drove through a stop sign at an automatic toll booth without paying the toll. Officer Keith pulled them over at 12:20 p.m. Officer Dempsey joined Keith as a backup. Keith asked for and received the defendants' drivers' licenses and the rental agreement in place of a registration card. These checked satisfactorily. He explained to the driver, Limonja, that he had stopped her because she had run the automatic toll booth without stopping or paying. When asked why she had done so, she replied that she did not have a dime, the required exact change. From his vantage point outside of the car, Keith noticed, according to his testimony, "a part of the radar detector on the other side of the vehicle in the passenger seat." On cross-examination, Keith stated that he "could see a portion of it" but did not

know "exactly" what it was.

Having determined that the vehicle had been rented in Florida, that the driver was Hispanic, that no luggage was in the vehicle, and that a radar detector was partially in view on the passenger's side of the vehicle, Keith asked permission to search the vehicle, suspecting the two individuals of drug trafficking. When the defendants consented to a search, Keith had both Limonja and Brooks exit the vehicle and move to the rear where they would be "away from traffic." Officer Dempsey stated that he was "positioned at the side of the occupants looking to see that they did not get hit." Keith proceeded to search the passenger compartment and trunk.

During the course of the search, Keith took possession of the radar detector behind the right front passenger seat. He also found a dime and four nickels in the ashtray located on the dash. In the trunk, Keith found suitcases and a gift wrapped package. Keith asked Brooks and Limonja which piece of luggage belonged to them. They each identified their luggage. The suitcases were searched but nothing unusual was found. Keith then asked to whom the gift wrapped package belonged. Defendant Brooks stated that it belonged to neither of them and that he was delivering it for a friend. Keith thought the package was addressed to "Ray," Brooks' first name, but Brooks said that it was addressed to "Roy." Although he said that he did not know what was inside of it, Brooks stated that he had written and placed the label on the package. According to the testimony of Keith, although it was not a hot day, Brooks "broke out in a heavy sweat under both arms while we were talking about the package" and "once I took the package and had it set on the front of my car, . . . Mr. Brooks had his mind strictly on that package." Brooks eventually signed a written consent to open the package.

Shortly after the vehicle was stopped, Officer Keith again requested the State Police communication center to obtain a narcotics dog. When the dispatcher discovered their own narcotics dog was not available, he contacted the Chesterfield County police, the Petersburg police and other area jurisdictions in an effort to obtain a narcotics dog. While waiting for the narcotics dog to arrive, Brooks withdrew his consent to search the package at 12:48 p.m., saying that he wanted to wait and see what the narcotics dog did.

At 1:10 p.m., a narcotics dog from Chesterfield County arrived on the scene. Approximately fifty minutes had elapsed. The dog, an experienced drug detection canine, alerted on the package. Keith then explained to Brooks what had occurred. Brooks asked Keith: "What happens if I don't let you open the package?" In response to the question, Keith then "explained to him that [he] would have to get a search warrant to open it since the dog had hit on it." Brooks then consented, stating that the package was not his and he did not know what was in it.

Keith had difficulty opening the package which was covered with electrical tape. Brooks provided a nail file to assist him. As the package was being opened, Brooks inquired, "What if it's a radar detector?" The package consisted of gift wrapping of a cardboard box bearing the markings of Micronta Road Patrol XK radar detector device which was the same make and model number of the radar detection device found earlier and served as a basis for the radar detection violation. When Keith opened the package, he found a white powder substance, subsequently determined to be approximately 1000 grams of cocaine of 82.2 percent purity. Both defendants were then arrested. The time of the arrests was 1:20 p.m. Another search of Brooks' suitcase disclosed an additional 300 grams of cocaine of 78.4 percent purity.

After opening the package, additional time was taken at the scene to search the baggage of the parties and to make provisions for the security of their vehicle. Officer Keith left the scene at approximately 3:30 p.m. to go to the magistrate's office. Finding the magistrate extremely busy, Keith had to wait. The arrest warrant on the drug charge and the traffic citations (which had been written at the scene but not issued to the defendants) were finally processed and executed upon the defendants between 4:00 p.m. and 6:00 p.m.

Prior to trial, Limonja and Brooks moved to suppress all evidence obtained incident to the stop, contending the stop was illegal because it was not based upon probable cause or reasonable and articulable suspicion. Over their objection, the motion to suppress was denied.

## II.

Although Limonja and Brooks admit that the police could lawfully have stopped them for running the automatic toll booth stop sign, they claim the stop was pretextual because it was for the purpose of conducting an illegal investigation of suspected criminal activity. As proof that the stop was pretextual, they point to the fact that the stop occurred at 12:20 p.m., that the traffic summons was not issued until 4:30 p.m., and that, during the interim period, the police focused their attention upon the contraband investigation. They maintain that, as a consequence of this unlawful conduct, all of the subsequent acts are tainted by the initial alleged illegality.

The Commonwealth asserts that the police were justified in stopping the defendant's vehicle for its failure to stop at the stop sign in violation of Code § 46.1-173[1] and failure to pay the required toll in violation of Code § 33.1-345(8).[2] Further, it maintains that unless the defendants can demonstrate that the police do not ordinarily stop people who run through stop signs and toll booths, no pretext can be claimed.

■ The objective sufficiency of the reasons for the stop is the test for determining whether the stop is pretextual. Police actions are to be tested "under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved." *Scott v. United States*, 436 U.S. 128, 138 (1978)(footnote omitted).

---

[1] Code § 46.1-173 states, in pertinent part:

A. The State Highway and Transportation Board may classify, designate and mark state highways and provide a uniform system of marking and signing such highways under the jurisdiction of this Commonwealth . . . . The driver of a vehicle shall obey and comply with the requirements of road signs erected upon the authority of the State Highway and Transportation Board.

C. The failure of such driver to obey such signs, signals, markings or lights or to comply with the provisions of this section shall constitute a traffic infraction.

[2] Code § 33.1-345(8) provides that fialure or refusal to pay a toll constitutes a Class 1 misdemeanor. For reasons unknown, Officer Keith did not arrest defendant Limonja on this offense. Had he done so, a warrantless search of the car's passenger compartment and any containers therein would have been justified as incident to an arrest. *See New York v. Belton*, 453 U.S. 454 (1981).

Effective July 1, 1988, failure or refusal to pay a toll is a traffic infraction in violation of Code § 46.1-229.4.

[T]he validity of an arrest is normally gauged by an objective standard rather than by inquiry into the officer's presumed motives. If this were not so, an arrest's validity could not be settled until long after the event; it would depend not only on the psychology of the arresting officer but the psychology of the judge.

*United States v. McCambridge*, 551 F.2d 865, 870 (1st Cir. 1977). "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (quoting *Scott*, 436 U.S. at 136, 138-39 n.13). "[I]n determining whether an investigative stop is invalid as pretextual, the proper inquiry is whether a reasonable officer would have made the seizure in the absence of illegitimate motivation." *United States v. Smith*, 799 F.2d 704, 708 (11th Cir. 1986)(emphasis in original).

In *Horne v. Commonwealth*, 230 Va. 512, 339 S.E.2d 186 (1986), the defendant was a suspect in a rape and murder investigation. When the police learned of two outstanding misdemeanor warrants against him, they arrested him on those charges but interrogated him concerning the rape and murder investigation. The defendant confessed. On appeal, the defendant argued that the misdemeanor arrests were pretextual and therefore all evidence derived therefrom should have been suppressed. *Id.* at 514-15, 339 S.E.2d at 188. The Virginia Supreme Court disagreed:

[E]ven though the officers were acting on the basis of warrants, [the defendant] would have us analyze the motive of the police. We think such an approach would be unworkable. It would require a judge in every squad car. In every case of an arrest pursuant to a warrant, the court would have to look over the shoulder of the police, and ask, "Why is he really arresting this person?" We reject this subjective approach in a case such as this where the officers were executing warrants.

*Id.* at 517, 339 S.E.2d at 189-90. "[I]f the arrest is bona fide," held the Court, "the police can make preplanned coordinated use

of the arrest to give them the opportunity to ask questions about matters for which probable cause to arrest does not exist." *Id.* at 517, 339 S.E.2d at 190.

The same reasoning applies when a traffic infraction rather than an arrest is the basis for the stop. It is inappropriate in either case to attempt to determine the true motive of the officer. Rather, the appropriate test is whether a reasonable officer would have made the seizure.

In the present case, the police had the authority to stop the motor vehicle for failing to stop at a stop sign in violation of Code § 46.1-173(C) and for failing to pay the required toll in violation of Code § 33.1-345(8). We believe that any reasonable police officer who observed such conduct would have seized that individual and issued him a citation or an arrest warrant. *See McCambridge*, 551 F.2d at 870 (stopping defendant for "following too closely" was not pretextual where sheriff had just stopped another driver for same offense); *cf. Smith*, 799 F.2d at 709 (stopping defendant for failure to change lane safely and reckless driving was pretextual where driver only deviated six inches from road and weaved slightly within a single lane of an interstate highway). Therefore, we find that the initial stop was not pretextual.

## III.

The Commonwealth further justifies the extended detention on the basis of consent. The defendants contend that the consent they gave was obtained by coercion and deception, and that the Commonwealth did not meet its burden of proving the consent was freely and voluntarily given. They claim that they were never apprised of their right to leave the scene or to refuse the search.

Where consent is freely and voluntarily given, probable cause and a search warrant are not required. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The defendants are correct in asserting that the burden is on the Commonwealth to prove the voluntariness of the consent. *Lowe v. Commonwealth*, 218 Va. 670, 678, 239 S.E.2d 112, 117 (1977), *cert. denied*, 435 U.S. 930 (1978). Whether the consent was freely given is a question of fact to be determined from "the totality of all the circumstances." *Id.* The voluntariness of the consent is a question of fact to be determined by the trial court and must be accepted on appeal unless

clearly erroneous. *Stamper v. Commonwealth*, 220 Va. 260, 268, 257 S.E.2d 808, 814 (1979), *cert. denied*, 445 U.S. 972 (1980).

In *Schneckloth*, the Supreme Court established the standard to determine voluntariness of a consent:

[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

412 U.S. at 248-49.

█ The evidence in this case adequately establishes that Limonja and Brooks voluntarily and intelligently consented to a search of the vehicle. Officer Keith approached the defendants' vehicle and explained to them that he had stopped them because the operator had run the automatic toll booth. At that point, Keith asked for permission to search the vehicle. Both defendants gave oral consent, first Limonja and then Brooks. Keith had them exit the car and stand to the rear in order to be away from traffic. The search was not made upon any claim of authority by the police; there was no show of force by the police; there were no threats; the defendants have claimed no mental or emotional infirmity nor does the record disclose any; and there has been no deception as to identity or purpose on behalf of the police. Furthermore, Officer Keith's failure to inform the defendants of their fourth amendment protections or their right to refuse consent does not render the consent involuntary. *United States v. Watson*, 423 U.S. 411, 425 (1976).

Although the defendants claim coercion and deception, they have not pointed to any specific facts in the record to support these conclusions. There is no evidence of coercion or deception on the part of the police. Because a valid consent to search obviates the need for probable cause or a warrant, it was not necessary for

the Commonwealth to prove probable cause to search.

## IV.

The defendants contend that even if the traffic stop was valid, the traffic citation should have been issued and they should have been permitted to go on their way. They argue that when the police detained them over an extended period of time without probable cause and searched their car and its contents, they exceeded the scope of their authority and the purpose of the stop, requiring suppression of the evidence seized as a result of the search.

The Commonwealth does not claim probable cause for the search, but justifies the continued detention upon the standards announced in *Terry v. Ohio*, 392 U.S. 1 (1968). The Commonwealth claims that the police possessed reasonable suspicion based upon articulable facts to justify the detention beyond the time necessary to issue the traffic summons. Further, the Commonwealth maintains that the extended detention was justified because the defendants voluntarily consented to it.

As stated in part III of this opinion, we find that the oral consent to search the car was freely and voluntarily given. Written consent was then given to search the gift wrapped package but was withdrawn at 12:48 p.m. Because the detention was consensual until that point, only the delay thereafter must be considered in determining whether the length of the detention was unreasonable. Approximately twenty-two minutes elapsed between withdrawal of Brooks' consent and when the narcotics dog alerted on the package.

At the time consent to search the gift-wrapped package was withdrawn, the police knew that the defendants matched some of the criteria of the drug courier profile, an informally compiled abstract of characteristics that experience has shown are typical of persons transporting illicit drugs: (1) the defendants were driving a Florida rental vehicle from Miami; (2) they were traveling north on I-95, a known route of drug traffickers from Florida to the northeast; (3) two persons were in the car, one of whom was Hispanic; and (4) no luggage was seen in the vehicle. Furthermore, they knew that the defendants were in possession of a radar detector in violation of Code § 46.1-198.1. Defendant Limonja lied about her reason for running the toll booth; she did, in fact,

426

have the required exact change. Defendant Brooks became very nervous and sweated heavily when the gift-wrapped package was discovered, and, although he said he knew that it was addressed to "Roy" because he placed the label on it, he said it was not his and that he did not know what was in it. We find that this combination of articulable facts gave the officers reasonable suspicion to justify the detention after the consensual stop ended.

The defendants contend that the police exceeded the bounds of an investigatory stop by detaining them for over sixty minutes. Thus, argue the defendants, probable cause to arrest was required and since it did not exist, any evidence seized must be suppressed. However, as just stated, only twenty-two minutes of the detention were without consent, not sixty, as the defendants contend.

■ "[T]here is [no] litmus paper test for . . . determining when a seizure exceeds the bounds of an investigative stop." *Royer v. Florida*, 460 U.S. 491, 506 (1983). The Supreme Court has refused to adopt a "hard-and-fast time limit for a permissible *Terry* stop." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *United States v. Place*, 462 U.S. 696, 709 n.10 (1983). "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685.

> In assessing whether a detention is too long in duration to be considered an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

*Id.* at 686.

Using the foregoing test, courts have upheld detentions of forty-five minutes, *United States v. Davies*, 768 F.2d 893, 901 (7th Cir.), *cert. denied*, 474 U.S. 1008 (1985); fifty minutes, *United States v. Alpert*, 816 F.2d 958, 964 (4th Cir. 1987); sixty minutes, *United States v. Large*, 729 F.2d 636, 639 (8th Cir. 1984); *United States v. Campbell*, 627 F. Supp. 320, 325-26 (D. Alaska 1985), *aff'd*, 810 F.2d 206 (9th Cir. 1987); and seventy-five min-

utes, *United States v. Borys*, 766 F.2d 304, 313 (7th Cir.), *cert. denied*, 474 U.S. 1082 (1985). Each of the last four cited cases involved delays necessitated by efforts to obtain a narcotics dog for sniffing luggage or packages, as in this case.

The defendants' reliance upon *United States v. Place*, 462 U.S. 696 (1983), is misplaced. In *Place*, the Court found that the police had not "diligently pursue[d] their investigation" because they "knew the time of Place's scheduled arrival at LaGuardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on [Place's] Fourth Amendment interests." *Id.* at 709. In our case, however, as in *United States v. Quinn*, 815 F.2d 153, 158 (1st Cir. 1987), there was "no way that the agents could have greatly shortened their inquiry if they were to 'confirm or dispel their suspicions' meaningfully." Unlike *Place*, the police, in this case, had not been investigating the defendants, had not anticipated the encounter, and could not have dispelled their suspicions more quickly.

Even in airport cases, the courts have recognized that there is no requirement that narcotics dogs be maintained at the airport so as to be "immediately available." *Borys*, 766 F.2d at 314; *see Alpert*, 816 F.2d at 964. It is just as clear that there will be inevitable delay in obtaining a dog to sniff luggage or packages transported on interstate highways. If, as in this case, the officers make a diligent effort to obtain a dog, continued detention during the delay does not violate the constitution. Therefore, applying *Place* and *Sharpe*, we find that the detention did not exceed the permissible bounds of an investigatory stop.

## V.

Finally, the defendants contend that Brooks' consent to open the package was not freely and voluntarily given but rather was the result of coercion and deception. This contention is without merit. When the narcotics dog alerted on the package, probable cause to search existed. *United States v. Race*, 529 F.2d 12 (1st Cir. 1976). Officer Keith told Brooks that if he did not consent, Keith could get a search warrant. Keith did not misrepresent the situation to Brooks, and no evidence exists that any of the other factors negating voluntary consent, as discussed in part III of this

opinion, were present. Therefore, we find that the consent to search the gift wrapped package was voluntary and the evidence obtained pursuant to the search was properly admitted into evidence.

For the reasons stated, we affirm the judgment of the trial court.

*Affirmed.*

Duff, J., concurred.

Benton, J., dissenting.

I respectfully dissent. In affirming this conviction the majority sanctions a warrantless seizure, based on less than probable cause, of a package removed from an automobile trunk during a traffic stop. The majority further holds that because the occupants of the automobile fit a drug courier profile, they could be detained for a substantial period of time while law enforcement officers sought to locate a dog for the purpose of sniffing the package for narcotics. Because the conduct of the law enforcement officers in detaining the occupants was unreasonable and unnecessarily intrusive, I would hold that a fourth amendment violation occurred and I would suppress the fruits of the unlawful seizure and detention.

A full account of the facts is necessary to disclose the purposefulness of the officer's conduct and to demonstrate the illegality of the extraordinary detention of the package and the occupants of the automobile. The facts show that State Trooper Thomas Keith was patrolling in an unmarked vehicle when he saw a Florida rental automobile traveling north on Interstate 95. Keith determined that the automobile and its two occupants, Margaret Mary Limonja, the driver, and Raymond James Brooks, fit a drug courier profile. Although the evidence does not indicate that the automobile was exceeding the speed limit, Trooper Keith began "pacing" the automobile because he was "trying to . . . get the speeding ticket." He also called his dispatcher for a check of the license plate number; however, the record system computer was not working. Before he "got a pace on them," the automobile left the interstate highway. Solely because he believed that the automobile fit a drug courier profile, Keith followed the automobile. He parked his vehicle and observed the automobile as it went to

one gas station that was closed and then proceeded to another that was open for business. Keith waited and watched while Limonja went to the restroom and Brooks got gas and checked the oil.

Keith contacted State Trooper Dempsey while he was watching the automobile. He told Dempsey that he was observing an automobile that fit a drug profile and that he "was going to wait to see if [he] could get a pace on them." Dempsey, who was driving a marked state police vehicle, indicated to him that he was coming to that location.

Keith followed the automobile when it left the gas station. He testified that "[s]ometime in between the time that the car left the Exxon station" and before it reached the toll gate to enter the highway he decided to call for a narcotic's detection dog. He told Dempsey that he wanted a dog and "[a]s far as [he knew the request for a dog] was made by Trooper Dempsey" before Limonja drove back onto the interstate highway.

Because the automobile "didn't stop when [it] went through [an unmanned, automatic toll] booth," Keith activated his grill lights and stopped the automobile as it re-entered the interstate highway. Dempsey testified that he was already at the southbound side of the same exit when he received Keith's call. Dempsey testified: "I was stationary looking directly over to the northbound lane when I saw the vehicle go right through the toll booth plaza, the stop sign. It did not stop for the stop sign at all."

Keith stopped Limonja at 12:10 p.m., informed her "that she had run the automatic toll booth," and asked "was there any particular reason why she did this." She told him that she only had four quarters and the toll booth required exact change of ten cents. He then asked for her driver's license and automobile rental agreement. From his position outside the automobile Keith saw no luggage in the passenger compartment and saw an object under Brooks' seat that he was unable to identify.[3] After he received the

---

[3] At the conclusion of the Commonwealth's recross examination of Officer Keith, the trial judge questioned Keith concerning the items that he was able to see from outside the car and before the search:

The Court: . . . Did you see any money from the outside of the car on the floor in the car?

The Witness [Officer Keith]: No, sir.

The Court: You did not. Did you see the radar detector?

license and rental agreement, Keith asked to search the automobile. He testified that Limonja and Brooks permitted the search. They were told to leave the automobile and were guarded by Dempsey as they stood on the shoulder of the highway.[4] During the search of the automobile, Keith first found a radar detector "partially stuck in behind underneath the right front seat where Mr. Brooks was sitting." Keith testified that both the toll booth offense and the possession of a radar detection offense are traffic offenses that are handled through the issuance of citations.

When Keith began his search of the trunk, Brooks and Limonja were required to identify their luggage. Keith searched the luggage but found no contraband. A gift wrapped package was removed from the trunk and placed on the hood of Keith's idling automobile. When the package was discovered, Dempsey again called concerning the dog. Brooks told Keith that he was delivering the package for a friend and he was asked by Keith to sign a written consent to search the package. Brooks signed the document at 12:45 p.m. but then revoked the consent at 12:48 p.m. When Brooks revoked his consent, he and Limonja were not permitted to leave and were required to wait on the side of the highway while the officers continued their efforts to locate a narcotics detection dog and have it brought to the scene. While they waited, Keith questioned Limonja and Brooks concerning their destination and the package. The gift wrapped package remained on the hood of the idling police vehicle while Dempsey was on his radio attempting to locate a dog.

When the dog arrived at 1:13 p.m., the package was removed from the hood of Keith's automobile and placed on the front seat of the rental automobile. Limonja needed to use a toilet and, after

---

The Witness: I could see a portion of it.

The Court: Did you know what it was?

The Witness: Not exactly. No sir.

[4] Officer Dempsey testified:

(1) "I was posted at the side of the road with [Brooks and Limonja];"

(2) "They [Brooks and Limonja] were up on the grass when I was watching them;" and

(3) "I was . . . watching out for the safety of the Trooper [Keith]."

More specifically, Dempsey testified that he was posted "on the grass portion of the highway, actually off of the highway, watching the vehicle and watching the traffic, and watching [Brooks and Limonja]." Dempsey said that his "main concern was the people [Brooks and Limonja] on the side of the road . . . [t]en or twenty feet on the hill."

the dog arrived, was taken by Trooper Worrell at 1:19 p.m. to a toilet in a nearby restaurant. At 1:23 p.m. Keith requested assistance for preparation of a search warrant for the package. Worrell returned with Limonja to the scene at 1:32 p.m. After Trooper Worrell returned to the scene, he saw the dog go around the automobile and then into the automobile. The state police dispatcher's log reflects that Worrell advised the dispatcher at 1:36 that dog had "a positive hit." Keith told Brooks that if he did not consent to a search of the package, a search warrant would be secured. Brooks then permitted the search which led to the discovery of cocaine. Limonja and Brooks were arrested and later taken to the magistrate's office. The traffic citations were given to Limonja at the magistrate's office at 4:30 p.m.

"The Fourth Amendment is . . . a guarantee against . . . *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985). In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court recognized a "narrowly drawn" exception to the fourth amendment requirement of probable cause, and held that a police officer may conduct an investigative stop where he is able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

"*The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.*" The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests. *The scope of the detention must be carefully tailored to its underlying justification.*

The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. *This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.* Similarly, the investigative methods employed should be the least intrusive means reasonably

available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Florida v. Royer*, 460 U.S. 491, 500 (1983)(citations omitted)(emphasis added). A detention for investigative purposes subsequent to a valid traffic stop and unrelated to the justification for that initial stop may be so extended as to be unreasonable and violative of the fourth amendment. *See United States v. Recalde*, 761 F.2d 1448, 1455 (10th Cir. 1985).

In the present case the Commonwealth failed to demonstrate that the seizure of Limonja, Brooks, their vehicle, and their belongings were "justifi[ed] on the basis of a reasonable suspicion . . . sufficiently limited in scope and duration to satisfy the conditions of [the] investigative seizure." *Royer*, 460 U.S. at 500. Although Keith's testimony provides a sufficient basis upon which to conclude that Keith stopped the automobile because of the drug courier profile, he testified that he stopped the automobile, in fact, because Limonja had failed to pay a toll at the booth and had run the toll's stop sign. "[A] brief delay while [a law enforcement officer] issued a traffic citation was inevitable, proper, and minimally intrusive." *Recalde*, 761 F.2d at 1455.

Although the documents were in order, Keith did not then issue a citation for the traffic violation. Instead, while retaining their identification, he asked Limonja why she had run the toll gate. Because Keith intended to pursue his suspicions that they were drug couriers, he sought and obtained from Limonja and Brooks consent to search the interior of the automobile and trunk. Thereafter, Keith obtained a written consent from Brooks to open the wrapped package found within the trunk; however, Brooks validly revoked the consent before the officer opened the package. *See Mason v. Pulliam*, 557 F.2d 426 (5th Cir. 1977)(consent may be revoked); *United States v. Homburg*, 546 F.2d 1350 (9th Cir. 1976), *cert. denied*, 431 U.S. 940 (1977)(same). Assuming the validity of the intrusion that occurred prior to the withdrawal of consent, it is at this point that the scope and subsequent duration of the ensuing detention and search were clearly no longer " 'strictly tied to and justified by' the circumstances which ren-

dered [their] initiation permissible." *Terry*, 392 U.S. at 19 (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967)(Fortas, J., concurring)).

Our Court recently held in *Taylor v. Commonwealth*, 6 Va. App. 384, 369 S.E.2d 423 (1988) (en banc), that reasonable, articulable suspicion that illegal narcotics are being transported cannot rest solely on the fact that a traveller matches a drug courier profile. *See also Reid v. Georgia*, 448 U.S. 438, 441 (1980). Seizures premised solely on a belief that individuals match a drug courier profile are violative of the fourth amendment. *Id.* Since the drug courier profile did not provide a reasonable, articulable suspicion that Brooks and Limonja were transporting drugs, the continuing seizure and detention were unlawful. When Brooks withdrew his consent and the law enforcement authorities said that a dog was on its way and that a search warrant would be obtained, the seizure of the package, Brooks, and Limonja continued, *see United States v. Place*, 462 U.S. 696, 707 (1983), based upon nothing more than an "inchoate and unparticularized suspicion or 'hunch' " that the gift wrapped package found in the luggage of the car contained drugs. *Terry v. Ohio*, 392 U.S. 1, 27 (1967).

Not only was the continued seizure unlawful but the delay which occurred as the officers sought to validate their suspicions exceeded the bounds of reasonableness. The constitutional limits of the duration and scope of the detention subsequent to the revocation of Brooks' consent and prior to the discovery of the narcotics must be measured solely by its relation to the only valid purpose of the stop — the issuance of a traffic citation. A police officer is allowed "to detain an individual stopped for [a traffic violation] only the time necessary to obtain satisfactory identification from the violator and to execute a traffic citation." *United States v. Luckett*, 484 F.2d 89, 91 (9th Cir. 1973). In this case the extraordinary detention occurred because "the officers' subsequent actions were motivated entirely by their suspicions of narcotics," *Recalde*, 761 F.2d at 1455; thus, the detention bore no relationship to the observed traffic violation.

In my view, the additional forty-eight minute detention of Brooks and Limonja, which occurred after Brooks revoked his consent and before the cocaine was discovered, was unrelated to the purpose of issuing a traffic citation. Keith testified that the

traffic citations had been written ten minutes after the initial stop. However, when the dog was reported to have "alerted" on the package, the officers had not issued traffic citations even though one hour and twenty-six minutes had passed since officers stopped the vehicle. Until the time the dog alerted, the officers had observed no additional factors that would justify detention beyond the time Brooks revoked his consent.

The detention of Limonja and Brooks that occurred after the revocation of Brooks' consent became "in important respects indistinguishable from a traditional arrest." *Dunaway v. New York*, 442 U.S. 200, 212 (1979). During the roadside detention, Keith did not return Brooks' or Limonja's identification papers or issue traffic citations. They were informed neither that their licenses and papers would be returned nor that they could leave. The issuance of the traffic citations some four hours after the vehicle had been stopped conclusively establishes that they could not have left. Thus, Limonja and Brooks were captives of the officers for whatever time the officers deemed necessary to investigate and probe their suspicions. "The inescapable conclusion to be drawn from the record is that the officers, lacking probable cause to arrest [Limonja] for [transporting illegal drugs,] seized [and] detained [them at the roadside] . . . in the hope of developing sufficient probable cause." *Recalde*, 761 F.2d at 1456. "The police conduct in this case cannot be characterized as minimally intrusive. This sort of police activity is an abuse of investigative detention and violates the Fourth Amendment." *Id.*

"[The] police procedures [became] qualitatively and quantitatively . . . so intrusive with respect to [Brooks' and Limonja's] freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments." *Hayes v. Florida*, 470 U.S. 811, 815-16 (1985). "In assessing whether a detention is too long in duration to be justified as an investigative stop . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686 (1985). Whether the police have acted with due diligence may be measured solely as a function of the amount of time that elapses. *See Place*, 462 U.S. at 709-10. Unlike the twenty minutes detention in *Sharpe*, which was attributed entirely to the evasive actions of the

defendant in that case, *see* 470 U.S. at 687-88, Limonja and Brooks bore no responsibility for the extensive detention to which they were subjected. Here the detention delay was solely attributable to the law enforcement officers; thus, "[t]he length of the detention . . . alone precludes the conclusion that the seizure was reasonable." *Place*, 462 U.S. at 709.

The suggestion that Brooks consented to the search of the package after the illegal detention and the sniff by the narcotics detection dog must also fall. As earlier stated, the police "made a 'seizure' of [the package] for purposes of the Fourth Amendment when, following his refusal to consent to a search," the police called for assistance in arranging for the issuance of a search warrant and detained the package, Limonja, and Brooks while a dog was being located. *See Place*, 462 U.S. at 707. Not only had Brooks been seized when he gave his second oral consent to open the package, but also the scope of a legitimate investigative stop had been exceeded.

Because the seizure and detention exceeded lawful limits, the consent that was obtained was tainted by the illegality. The evidence in this record does not establish a break in the causal connection between the illegal detention and the evidence obtained as a consequence of the illegality. *See Dunaway*, 442 U.S. at 217-18; *Brown v. Illinois*, 422 U.S. 590, 602-05 (1975). An alleged consent must be "sufficiently an act of free will to purge the primary taint" of the illegal detention. *Brown*, 422 U.S. at 602. The temporal proximity of the illegal detention and the "consent," the lack of intervening circumstances, and the flagrancy of the misconduct of the police all militate against the voluntariness of the consent. *See Dunaway*, 442 U.S. at 218; *Brown*, 422 U.S. at 603-04.

Here, the alleged consent occurred during the illegal detention; moreover, there were no intervening circumstances established on this record. The flagrancy of the misconduct and illegal detention can be measured by the "quality of purposefulness" of the officers' conduct. *Brown*, 422 U.S. at 605. Keith began "pacing" the suspected drug courier profile car in order "to get the ticket." He watched the car as it stopped to refuel and he had decided to call for a dog and stop the automobile before the driver committed a violation. Keith's intent to seize the automobile by some means is clearly evidenced by his own testimony that he informed Worrell

that he would resume his "pacing" when the automobile left the service area. In order to accomplish their ultimate goal of searching the seized automobile, the officers forced the occupants to remain at the roadside by not returning their licenses, papers, and by not issuing the traffic citations following the stop. To suggest that a detention which accompanied such a purposeful attempt to find a violation and which later continued for a period of forty-one minutes during the pursuit of an available narcotics dog is unobtrusive or reasonable is to close one's eyes to the command of the fourth amendment.

Moreover, the officers procured the "consent" only after Keith threatened to detain Limonja and Brooks further while he secured a search warrant. The coerciveness of the police action was apparent. From the outset this was "an 'expedition for evidence' admittedly undertaken 'in the hope that something might turn up.' " *Dunaway*, 442 U.S. at 218 (quoting *Brown*, 422 U.S. at 605).

> The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation. The entire deterrent purpose of the rule excluding evidence seized in violation of the Fourth Amendment rests on the assumption that "limitations upon the fruit to be gathered tend to limit the quest itself." Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.

*Terry*, 392 U.S. at 28-29 (citations omitted).

Finally, the majority incorrectly relies upon *Place* to hold that a search did not occur when the dog was used to sniff the package and the contents of the automobile. *Place's* holding that "exposure of respondent's luggage, which was *located in a public place*, to a trained canine - did not constitute a 'search' within the meaning of the Fourth Amendment" is inapposite to this case. 462 U.S. at 707 (emphasis added). Here the package that was sniffed was only in a public place because it was removed by the authorities from the trunk of the automobile and detained on the hood of the idling police vehicle. The use of a narcotics detection dog to sniff a

package that has been placed in the public domain by unlawful police action such as under the circumstances of this case constituted a warrantless search without probable cause.[5]

For these reasons, I would hold that the motions to suppress should have been granted.

---

[5] It should also be noted that in *Place*, the Court recognized that when personal luggage is seized from "the immediate possession of a suspect for the purpose of arranging exposure to a narcotics detection dog," police behavior may be less intrusive if the suspect is allowed to depart and leave his luggage with police because he "is technically still free to continue his travels or carry out other personal activities pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of custodial confinement or to the public indignity of being personally detained." 462 U.S. at 708; *see also United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987). In the instant case, however, Limonja and Brooks were not offered the less intrusive alternative of leaving the package with the officers and proceeding with their travels. Instead they were subjected to a *defacto* arrest. Furthermore, even if Limonja and Brooks had been allowed to leave without the package "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in absence of probable cause." *Place*, 462 U.S. at 709.