UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Malveaux, Raphael and Senior Judge Petty
Argued at Richmond, Virginia


RASHEED ANTOINE JOHNSON

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1360-22-2          JUDGE MARY BENNETT MALVEAUX
                                                           APRIL 9, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Clarence N. Jenkins, Jr., Judge

Michelle C. F. Derrico, Senior Appellate Attorney (Virginia Indigent
Defense Commission, on briefs), for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following conditional guilty pleas, the trial court convicted Rasheed Antoine Johnson

("appellant") of possession with intent to distribute a Schedule I or II controlled substance, in

violation of Code § 18.2-248(C), and possession of a firearm while in possession of a Schedule I or

II controlled substance, in violation of Code § 18.2-308.4(A).  On appeal, he argues that the trial

court erred in denying his motion to suppress because there was no reasonable suspicion for a

protective sweep of the car in which he was a passenger, and because the traffic stop was

impermissibly extended into an illegal seizure.  For the following reasons, we affirm.

I.  BACKGROUND

At 8:30 p.m. on November 24, 2021, Richmond City Police Officers John Gilbert and

Luke Hunsaker saw a gray Chevrolet traveling 55 miles per hour in a 35 mile-per-hour zone.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

The officers followed the car for two blocks before activating their lights and sirens. The driver stopped the car after another three to four blocks. Gilbert noted that "[t]here were numerous streets that [the driver] could pull over onto the side as well as a parking lot," and thought it was "unusual" that "it took multiple blocks to pull over." Gilbert had patrolled that area of the city and described it as a "high crime area, high violen[ce] area" where he had made "numerous" arrests.

Gilbert approached the driver's side door while Hunsaker approached the front passenger side door. Jameese Kamac was in the driver's seat, and appellant was in the front passenger seat. Gilbert told Kamac that he had stopped her for speeding and asked her if she "had any ID on [her]." Kamac handed Gilbert her driver's license. Gilbert then asked if there were any weapons in the car, and Kamac and appellant both stated that there were none. Two more officers arrived while Kamac was handing her license to Gilbert.

Gilbert returned to his patrol car to check Kamac's license status. On his way to his car, he asked Hunsaker to obtain appellant's "ID." About 1 minute and 15 seconds after stopping the car, Gilbert ran Kamac's information through a database called "Driver's License Inquiry" and learned that her license had been suspended.

While Gilbert was checking Kamac's driving status, Hunsaker asked appellant to roll down the passenger side window. He then asked Kamac and appellant how they were doing, asked Kamac if she knew the applicable speed limit, and asked appellant for his name. Appellant told Hunsaker his first and last names, and immediately after this another officer, Officer Sledge, asked appellant if he "ha[d] any ID on [him]." After appellant shook his head no, Sledge asked for his name and date of birth. Appellant gave his first and last names as well as his date of birth.

At that point, Gilbert left his patrol car and walked to where Sledge stood beside Kamac's driver's side door. Sledge gave Gilbert appellant's name, and Gilbert returned to his patrol car to check appellant's information. At that time, a fifth officer, Officer Danco, arrived. Gilbert informed Danco that the reason for the stop was the vehicle's speed and that the driver failed to stop for five blocks. He also told Danco that the "dude in the side is sketchy A.F." and that he was going to check appellant's information. Gilbert did not run appellant's information through the "Driver's License Inquiry" database. Instead, he closed that database and ran appellant's information through another database. Gilbert was unable to find appellant's information in the database because he misheard appellant's first name and was running a search for "Rasheek Johnson." While Danco was attempting to search for appellant's information, he told Gilbert that "five blocks is enough to, to do [a protective sweep]—even if you didn't see furtive movement." Gilbert agreed and stated, "And especially, the speed was reckless." Gilbert testified that at that time, his only reasons for conducting a protective sweep were the vehicle's rate of speed and Kamac's delay in pulling over.

At that point, about 4 minutes and 30 seconds into the stop, Danco offered to "check DMV" in regard to appellant. Gilbert then approached Kamac, told her that her license was suspended, and asked her to exit her car, which she did. While Kamac was exiting the car, at about 5 minutes and 45 seconds into the stop, Hunsaker asked appellant if he had "a valid driver's license," and appellant shook his head, no. Hunsaker then asked appellant to step out of the car, and told him that because Kamac did not have a valid driver's license, the officers would "need somebody to drive the car."

Appellant exited the car and walked a few steps away from it, and Gilbert asked him to step to the back of the car. Gilbert then asked appellant three times, in quick succession, whether he had any weapons. After the third prompt, appellant stated, "Yeah, a registered firearm."

Gilbert asked appellant to raise his hands, which he did, and then frisked appellant and found a handgun in his front waistband. Gilbert placed appellant in handcuffs.

Gilbert then conducted a protective sweep of the car. He saw a black satchel which he described as "large enough to hold a firearm" on the front passenger seat. Within the satchel he found a plastic bag containing a white rock-like substance. The rock-like substance was later analyzed and found to be cocaine.

About 14 minutes into the stop, Gilbert told Kamac that he would not issue her a ticket for reckless driving and that she was free to leave. He did not impound her car. Gilbert told appellant that he would be "coming with" the officers, and then left with appellant in the patrol car about 24 minutes after the stop began.

The officers testified at the suppression hearing that appellant was calm and cooperative during the entire encounter and that neither appellant nor Kamac made furtive movements during the traffic stop.

Appellant filed a motion to suppress the evidence of the firearm found on his person and the cocaine discovered in the car, arguing that there was not adequate reasonable suspicion that he was armed and dangerous to justify the protective sweep of the car. Appellant also contended an illegal seizure occurred when the officers impermissibly extended the traffic stop.

The trial court denied the motion to suppress. The court found that, after learning that Kamac's license was suspended, "the officers had a decision to make in terms of, What are we going to do about the vehicle?" The court also found that, at the point in the stop challenged by appellant as an illegal seizure, "the officers were, in fact, trying to determine whether or not . . . [appellant] was someone who could actually drive this vehicle." Regarding the protective sweep, the court stated, "Now, whether or not . . . there was danger involved, I don't think that's a consideration perhaps the officers are thinking." Instead, the court found that the officers were

- 4 -

focused on what to do with the car because they had encountered two people who could not drive it legally. It further found that the situation "was not one where [the officers] were trying to further an investigation to find any other contraband."

This appeal followed.

## II. ANALYSIS

In reviewing a trial court's denial of a motion to suppress, "we determine whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error." *Roberts v. Commonwealth*, 55 Va. App. 146, 150 (2009). "[W]e defer to the trial court's 'findings of historical fact,' taking care to review them 'only for clear error and to give due weight to inferences drawn from those facts by resident judges.'" *Bagley v. Commonwealth*, 73 Va. App. 1, 13 (2021) (quoting *Malbrough v. Commonwealth*, 275 Va. 163, 169 (2008)). We "presume— even in the absence of specific factual findings—that the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence." *Hill v. Commonwealth*, 297 Va. 804, 808 (2019). Moreover, we defer "to the trial court's interpretation of all of the evidence, including video evidence that we are able to observe much as the trial court did." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). On appeal, we "view video evidence . . . for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did." *Id.* "However, we consider *de novo* whether [the trial court's findings of] fact[] implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment." *Hughes v. Commonwealth*, 31 Va. App. 447, 454 (2000) (en banc).

- 5 -

A. Protective Sweep

Appellant argues that the trial court erred in denying his motion to suppress because the officers lacked reasonable suspicion to justify a protective sweep of the car.[1]

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "A traffic stop is a '"seizure" of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment.'" *Jones v. Commonwealth*, 71 Va. App. 375, 380 (2019) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). A police officer's authority to conduct a protective sweep of a vehicle under certain circumstances was recognized by the United States Supreme Court in *Michigan v. Long*, 463 U.S. 1032 (1983). *See Maryland v. Buie*, 494 U.S. 325, 332 (1990) (noting that "[i]n a sense, *Long* authorized a 'frisk' of an automobile for weapons"). A roadside search of a vehicle, justified by police safety concerns, "is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "[P]olice may conduct a protective sweep of the vehicle based on the assumption that when the stop concludes, the individual presumably 'will be permitted to reenter his automobile' and 'will then have access to any weapons inside.'" *Bagley*, 73 Va. App.

---

[1] In his motion to suppress before the trial court, appellant asked the court to suppress the evidence of the firearm found during the frisk of his person as well the cocaine discovered during the protective sweep. On appeal, however, appellant's assignment of error challenges only the officers' basis for the protective sweep, which occurred after the discovery of the firearm. We thus confine ourselves to the question of whether the protective sweep violated appellant's Fourth Amendment rights. *See* Rule 5A:20(c)(1) (stating that "[o]nly assignments of error listed in the [opening] brief will be noticed by this Court"); *see also Moison v. Commonwealth*, __ Va. __, __ (Oct. 19, 2023) (noting that "[t]he purpose of assignments of error is to point out the errors with reasonable certainty in order to direct [the] court and opposing counsel to the points on which appellant intends to ask a reversal of the judgment, and to limit discussion to these points" (alterations in original) (quoting *Yeatts v. Murray*, 249 Va. 285, 290 (1995))).

at 15 (quoting *Long*, 463 U.S. at 1052). "[A] protective search is authorized even if the suspect is under police restraint at the time the search is conducted, because the suspect may be able to escape such restraint, or may later regain access to the vehicle if he is not arrested." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007).

"To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or 'hunch' . . . ." *McCain v. Commonwealth*, 275 Va. 546, 552 (2008). Instead, the officer must "supply a particularized and objective basis" for the stop or search. *Id.* "The requisite level of belief, when calibrated to reasonable suspicion, is less than probable cause, less than a preponderance, and certainly less than beyond a reasonable doubt." *Hill*, 297 Va. at 817 (emphasis omitted). "The standard requires proof of only a reasonable belief that the suspect *might* have a weapon and gain control of it." *Bagley*, 73 Va. App. at 16.

"In reviewing whether an officer possessed reasonable, articulable suspicion sufficient to justify a seizure, a reviewing court must consider 'the totality of the circumstances—the whole picture.'" *Mitchell v. Commonwealth*, 73 Va. App. 234, 247 (2021) (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)). This analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). "Circumstances relevant in this analysis include characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime." *McCain*, 275 Va. at 554. The inquiry is not whether an individual factor, viewed alone, "is susceptible to [an] innocent explanation" but whether the various factors,

- 7 -

"[t]aken together," are sufficient to "form a particularized and objective basis" for an officer's suspicion. *Arvizu*, 534 U.S. at 277.

Appellant argues that a protective sweep for weapons must be based upon reasonable suspicion that the person is dangerous and that here, there was no evidence to support a suspicion that he was a danger to the officers. We disagree, and conclude that the discovery of the firearm, together with the other circumstances of the stop, warranted a protective sweep of the car for additional weapons that might have endangered officers during and immediately after the stop.

Here, when the officers activated the patrol car's lights and sirens, Kamac did not stop the car until three to four blocks later, despite there being "numerous streets that [she] could pull over onto the side as well as a parking lot." While a driver may have numerous innocent reasons for failing to immediately stop, Kamac's failure to pull over for several blocks provided officers with a reasonable fear that the car's occupants could be using the delay to access weapons inside the vehicle. *See Gross v. Commonwealth*, 79 Va. App. 530, 539 (2024) ("[The defendant's] delay in pulling over by driving on for four blocks after the police had turned on their siren and flashing lights gave the officers reasonable concern that he might be reaching for and preparing to use a weapon against them during the traffic stop."). The stop also occurred in a "high crime area, high violen[ce] area" where Officer Gilbert himself had previously made "numerous" arrests. Further, when appellant was first asked if there were any weapons in the car, he falsely indicated that there were none. Gilbert later asked appellant three times, in quick succession, if he had any weapons, and appellant acknowledged that he did only after the third time he was asked. "[E]vasive behavior in the presence of the police is a pertinent factor in determining reasonable suspicion." *Wallace v. Commonwealth*, 32 Va. App. 497, 504 (2000). Finally, and significantly for our analysis, appellant admitted that he had a firearm on his person. The presence of the firearm raised obvious safety concerns for the officers. *See United States v.*

*Carico*, 311 F. App'x 572, 574 (4th Cir. 2008) ("[The defendant]'s disclosure that there was a firearm on the front passenger seat further highlighted the danger [he] posed to the officer."). Based on a consideration of all of these factors, we hold that the officers possessed an objectively reasonable suspicion to conduct a protective sweep of the car because the officers possessed a reasonable belief that appellant was dangerous and might gain immediate control of additional weapons in the car.[2]

Appellant argues, however, that the protective sweep conducted here was merely a pretext to conduct an unlawful search. Based on well-established Fourth Amendment principles, we reject this argument.[3] Here, Gilbert did express a desire to conduct a protective sweep in part because appellant looked "sketchy A.F." But the standard governing our review of the legality of the protective sweep is whether an objectively reasonable officer would have had reasonable suspicion to conduct the search. "[W]hether the conduct of a police officer is reasonable 'is

[2] Appellant further argues that there was no evidence that he was prohibited from carrying a concealed weapon, that "[a] permitted firearm is not evidence of criminal activity," and thus "the discovery of the firearm did not justify the search of the vehicle." While it is true that Code § 18.2-308(A) provides a statutory exception to the prohibition against carrying concealed weapons if an individual has a valid concealed handgun permit, it does not follow that the presence of a firearm is not a factor to consider in determining whether officers have reasonable suspicion to conduct a protective sweep. *See United States v. Robinson*, 846 F.3d 694, 695 (4th Cir. 2017) (noting that the issue in the case was whether the suspect was "reasonably believe[d] to be armed, regardless of whether the person may legally be entitled to carry the firearm"); *Adams v. Williams*, 407 U.S. 143, 146 (1972) (noting that a "frisk for weapons might be . . . necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law"). Furthermore, the statutory exception contained in Code § 18.2-308 is expressly made an affirmative defense, and in this case appellant provided no evidence that he had a concealed handgun permit.

[3] Appellant relies on *Knight v. Commonwealth*, 71 Va. App. 771 (2020), in support of this argument. *Knight* is inapposite as it involves a specific doctrine—the inventory search exception to the warrant requirement—that is not at issue here. *See id.* at 784 (noting that the "inventory exception does not apply when the inventory is merely 'a pretext concealing an investigatory police motive'" and holding that the officers' inventory search in that case was merely a pretext concealing an investigatory motive by the officers (quoting *Reese v. Commonwealth*, 220 Va. 1035, 1039 (1980))).

judged from the perspective of a[n objectively] reasonable officer on the scene allowing for the need of split-second decisions and without regard to the officer's [subjective] intent or motivation.'" *McArthur v. Commonwealth*, 72 Va. App. 352, 360 (2020) (second and third alterations in original) (quoting *Thompson v. Commonwealth*, 54 Va. App. 1, 7 (2009)). The determination of "[w]hether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." *Limonja v. Commonwealth*, 7 Va. App. 416, 422 (1988) (quoting *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985)). Accordingly, "in determining whether an investigative stop is invalid as pretextual, the proper inquiry is whether a reasonable officer would have made the seizure in the absence of illegitimate motivation." *Id.* (quoting *United States v. Smith*, 799 F.2d 704, 708 (11th Cir. 1986)).[4] Thus, Gilbert's comment about his motivation for the search does not alter our conclusion that the officers had an objectively reasonable suspicion to conduct a protective sweep of the car.[5]

---

[4] Appellant also cites several cases where this Court or a federal court reversed a defendant's conviction after officers conducted, appellant alleges, "pretextual 'protective sweeps'" similar to the case at hand. But these cases are all distinguishable from the instant case, most significantly because none involved a protective sweep done *after* a firearm was found on the accused's person.

[5] Appellant also notes that the trial court specifically found the officers were not concerned about danger, as it stated, "Now, whether or not . . . there was danger involved, I don't think that's a consideration perhaps the officers are thinking." Appellant relies upon this statement to support his argument that no reasonable suspicion existed for the belief that either occupant of the car was armed or dangerous. But as we note above, the dispositive question is not whether these officers themselves felt that appellant was armed and dangerous, but instead whether an objectively reasonable officer would have, based on the circumstances presented. And, as we held above, based on our objective rather than subjective standard, we conclude that a reasonable officer would have had reasonable suspicion to believe that appellant was armed and dangerous, thus justifying the protective sweep of the car.

## B. Extension of Traffic Stop

Appellant argues that the trial court also erred in denying his motion to suppress because the officers improperly extended the traffic stop. Relying upon *Rodriguez v. United States*, 575 U.S. 348 (2015), and *Matthews v. Commonwealth*, 65 Va. App. 334 (2015), he contends that the amount of time required to address the traffic violation warranting the stop had expired prior to the protective sweep.

In *Rodriguez*, the United States Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." 575 U.S. at 350. "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350-51 (alterations in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Regarding what constitutes an officer's mission during a traffic stop, the Court found that this included not just "determining whether to issue a traffic ticket" but also typically "involve[s] checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355. The Court reasoned that "[t]hese checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

The Court in *Rodriguez* also held that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop" if he does not also have "the reasonable suspicion" of other criminal activity "ordinarily demanded to justify detaining an individual." *Id.* at 355. The seizure of the traffic stop "remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 355 (alteration in original) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). Due to the

- 11 -

inherent dangers associated with traffic stops, "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely," but "[o]n-scene investigation into other crimes . . . detours from that mission" and "so too do safety precautions taken in order to facilitate such detours." *Id.* at 356.

In regard to the particular circumstances present in *Rodriguez*, the Court held that a dog sniff that prolonged the traffic stop was impermissible, concluding that a dog sniff is "not fairly characterized as part of the officer's traffic mission" because it is not related to an inquiry into the traffic infraction at issue or officer safety. *Id.*

In *Matthews*, the other case cited by appellant, the officer stopped a car with an object dangling from the rearview mirror and then asked the driver about his criminal history and whether his tattoos were "prison tattoos." 65 Va. App. at 345. Applying *Rodriguez*, this Court held that the officer's unrelated discussions about the driver's criminal history and tattoos, and his request for a K-9 unit, "prolonged the duration of the traffic stop" beyond the time reasonably required to complete the process of issuing a warning ticket; thus, the seizure was illegal. *Id.* at 345-46.

Relying on these cases, appellant argues the evidence recovered from the search of the car should have been suppressed because the traffic stop was prolonged beyond what was required by the purpose of the stop. Appellant contends that Gilbert took no action regarding the purpose of the traffic stop, which was initially for speeding and later developed into driving on a suspended license, beyond his initial contact with Kamac. In support of this argument, appellant relies on his assertion that the officers did not check the status of appellant's driver's license until Gilbert ordered Kamac and appellant to get out of the car.

We reject appellant's argument because we disagree with his characterization of the officers' actions during the traffic stop. We conclude, instead, that the officers did not prolong

- 12 -

the traffic stop beyond the time required to address the traffic violation at issue—Kamac's driving on a suspended license and the subsequent need to find a driver for the car.

In the instant case, Gilbert quickly learned that Kamac was driving on a suspended license and therefore could not legally drive the car after the traffic stop concluded. *See* Code § 46.2-301 (prohibiting driving after one's driver's license has been suspended). In this situation, the officers were presented with the question of what to do with the car, and either needed to find someone who could drive it or arrange to have it towed. This inquiry is necessarily part of an officer's mission in conducting a traffic stop after learning that the driver of the vehicle is unable to legally drive it, because it serves to "ensur[e] that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355; *see also United States v. Gurule*, 935 F.3d 878, 884 (10th Cir. 2019) ("[T]he efforts on the part of law enforcement to help locate a licensed driver cannot be characterized as unconstitutionally extending [a] traffic stop."). Thus, we reject appellant's assertion that the stop's purpose had been fulfilled at the time that Gilbert learned that Kamac's driver's license was suspended. Rather, the officers needed to ascertain whether appellant, the passenger of the car, could legally drive it, and they did so here: when Gilbert returned to his patrol car to check Kamac's license status, he asked Hunsaker to obtain appellant's "ID"; Sledge asked appellant if he "ha[d] any ID on [him]," and after appellant said no, Sledge provided Gilbert with appellant's name and date of birth; Gilbert then entered appellant's information in a database on his patrol car's computer; when Gilbert was unable to find appellant's information in the database, Danco offered to make inquiries with DMV regarding appellant; while Kamac was exiting the car, Hunsaker then asked appellant if he had "a valid driver's license," and appellant shook his head, no; Hunsaker asked appellant to step out of the car, and told him that because Kamac did not have a valid driver's license, the officers would "need somebody to drive the car." Once appellant exited the car, he admitted to having a

- 13 -

firearm, and at that time the officers properly conducted a protective sweep of the car based on their reasonable suspicion that appellant was armed and dangerous.

We also reject appellant's contention that Gilbert's check of his information unlawfully prolonged the traffic stop. Appellant argues that a review of Gilbert's body camera video clearly indicates that Gilbert "was not checking whether [appellant] was a licensed driver" while he was entering appellant's information in a database, because Gilbert had closed the "Driver's License Inquiry" database and opened a separate database to check appellant's information. But there is no evidence in the record establishing that Gilbert's search of a different database was not an attempt to determine whether appellant was a licensed driver.[6] Here, the trial court found that at this point in the stop, "the officers were, in fact, trying to determine whether or not . . . [appellant] was someone who could actually drive this vehicle," and on appeal we cannot, with the evidence before us, conclude that this factual finding was plainly wrong.

Likewise, we conclude that the conversation between Gilbert and Danco during the traffic stop—Gilbert telling Danco he believed appellant seemed "sketchy A.F.," and then the officers discussing whether they had the justification to conduct a protective sweep—did not unlawfully prolong the stop. During the first conversation, Gilbert also informed Danco of the reason for the traffic stop, and during the second conversation, Gilbert used his computer to check a database for appellant's information. As noted above, in *Rodriguez*, the Supreme Court noted that an officer also "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "may not do so in a way that prolongs the stop" if he does not also have "the reasonable suspicion" of other criminal activity. 575 U.S. at 355. Here, Gilbert and Danco's

---

[6] At oral argument, counsel for appellant conceded that the purpose of the database used to search appellant's information—whether it was for driver's license status or criminal history—was not reflected in the record.

conversation did not prolong the traffic stop in any way because Gilbert was conducting tasks related to the mission of the stop during these discussions.

In *Rodriguez*, the Supreme Court explained that "an officer always has to be reasonably diligent" in pursuing the traffic-related purpose of the stop and that this diligence is gauged by "noting what the officer actually did and how he did it." *Id.* at 357. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. We conclude that, contrary to appellant's argument, the officers did not unnecessarily prolong the traffic stop. Instead, any extension of the traffic stop was necessitated by the officers' responsibility to secure a driver for the car which Kamac could not herself legally drive. The officers were engaged in this task, which was directly related to the mission of the traffic stop after learning that Kamac was driving with a suspended driver's license, up until the point when appellant admitted that he had a firearm. Because the officers had not reasonably completed the mission of the traffic stop at the time they developed reasonable suspicion for the protective sweep, we hold that the trial court did not err in denying appellant's motion to suppress.

### III. CONCLUSION

We hold that the trial court did not err in denying appellant's motion to suppress. Accordingly, we affirm the judgment of the trial court.

*Affirmed.*