UNITED STATES of America, Appellee,

v.

**John Michael McCAMBRIDGE,
Defendant, Appellant.**

Nos. 76–1147, 76–1310.

United States Court of Appeals,
First Circuit.

March 23, 1977.

Charles Hesser, Somerville, Mass., by appointment of the Court for appellant in Case No. 76–1147.

John Michael McCambridge, pro se on brief in Case No. 76–1310.

Harvey A. Silverglate and Silverglate, Shapiro & Gertner, Boston, Mass., on brief for Civil Liberties Union of Massachusetts, amicus curiae.

Robert B. Collings, Asst. U.S. Atty., Boston, Mass., with whom James N. Gabriel, U.S. Atty., Boston, Mass., was on briefs, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Defendant John Michael McCambridge filed two appeals after his conviction in the district court of attempted robbery of a federally insured savings and loan association in Peabody, Massachusetts, a violation of 18 U.S.C. §§ 2113(a) and 2.

## I. *The First Appeal*

Under the first appeal McCambridge alleges error in the denial of his pretrial motion to suppress evidence seized from his car upon his arrest several weeks after the robbery attempt; in the purportedly imprecise jury instructions given; and in the denial of his motions for acquittal. Further claims of error are made with respect to the court's refusal to declare a mistrial when Venere, a codefendant, pleaded guilty, and its failure to grant a motion to exclude jurors who might have overhead defense counsel state that he was visiting McCambridge at Walpole prison. McCambridge complains additionally that the trial was "unfair" because the Government advanced only in closing argument the theory that he could have been an aider and abettor.

Before discussing these contentions, we shall summarize the Government's case against McCambridge. There was evidence that on March 18, 1975, at approximately 10 a. m., a masked man entered the Boston Federal Savings and Loan Association in Peabody, Massachusetts, and announced a holdup. This caused a teller to panic, and she ran out the front door followed by the holdup man. A car was parked out front and, as the teller ran from the bank, a second masked individual got out of the passenger side and fired a shot at the teller which missed her. The car, driven by a third person, took off after both masked men jumped in. The getaway car, a Dodge

Polara with New Hampshire plates KL35, was recovered very shortly thereafter in a nearby parking lot with its motor running.

No witness identified McCambridge as having been at the scene, but his fingerprints were found on the outside rear view mirror of the getaway car and on one of two vodka bottles found on the floor of the car. There was evidence that the car had been stolen the day before between 8 a. m. and 10 a. m. and its license plates replaced with the New Hampshire plates. It was also shown that, about a week before the attempted robbery, McCambridge using the alias John O'Donnell, bought a used Plymouth in New Hampshire, registered it there, receiving the New Hampshire plates which were later to be found on the getaway car. The night before the attempted robbery, less than 12 hours prior, he checked into a Boston hotel at 10:49 p. m., again using his alias, and indicating on his registration card that he was driving a Plymouth with New Hampshire license plates KL35.

It was established that McCambridge acquired a birth certificate in his assumed name two days after the robbery attempt and that on the following day he flew across the country to the State of Washington taking with him a suitcase and some papers that had been in the Dodge Polara getaway car when it was stolen the day before the attempted robbery. These items were the subject of the motion to suppress to which we now turn.

a. *The Motion to Suppress*

McCambridge moved to suppress the suitcase and various items taken from him when he was arrested in the State of Washington after the robbery. At the pretrial hearing on his motion the following appeared: At approximately 3:30 p. m. on April 5, 1975, (about three weeks after the attempted holdup in Peabody, Massachusetts) Washington State Deputy Sheriff Miller observed in that State a car driven by McCambridge traveling at 50 mph in a 55 mph zone following ten-to-twenty feet behind another vehicle. "Following too closely" is a misdemeanor under Wash-

ington law, see Wash.Rev.Code §§ 46.61.-145, 46.61.010, and the sheriff had just stopped another vehicle for that offense when he observed McCambridge. Testifying at the suppression hearing, Sheriff Miller stated that normally he would issue a citation to a driver whom he stopped for following too closely, but that occasionally he might exercise his discretion and arrest the driver. The sheriff explained why he would arrest a driver for the traffic violation:

> "There could be outstanding arrest warrants on these people. They could have a temporary driver's license, did not have a picture, did not show good identification. It could be in relation to a drunk driving charge, it could be many things. . . . Some of them I didn't feel that by letting them sign the citation we would ever see them again. Some of them have been out of state. The policy is that we take them in and make them post. Numerous different reasons."

Upon observing the station wagon McCambridge was driving violating the law by "following too closely", Sheriff Miller "paced the vehicle to ascertain the speed." After determining that the car was travelling below the speed limit, the Sheriff attempted to stop it, first by activating his rotating overhead light over a quarter-mile distance. It was broad daylight and the driver gave no indication at that time that he had noticed the police car. Miller next sounded his siren, at which point the driver "first looked over his shoulder, looking behind towards my patrol vehicle. Then he started to bend forward during this period of time, as if he was hiding something or pushing something down in the front part of his vehicle." This made the Sheriff suspicious. While the driver was making these gestures "[t]he vehicle was swerving onto the shoulder of the highway." Finally, Miller ordered the driver to stop through a loud-speaker and the driver complied. The distance traveled from the beginning of the pacing of the vehicle to the actual stop was "approximately a mile or two miles, total distance." At no time did the car accelerate.

McCambridge was asked for his driver's license and the car registration, both taken from an envelope which McCambridge got from the glove compartment then left on the front seat. The license was a temporary one which had expired, and on which, it turned out, the birth date had been altered. The name on the license, Edward Robbins, matched the name on the automobile registration. Miller asked for no additional personal identification.

Observing that McCambridge "had an odor of intoxicants about his person" and that there was a 90 percent empty half gallon of wine on the floorboards, Miller asked McCambridge to get out of the car for a sobriety test. A "finger and nose test" and a "balance test" as well as observation of McCambridge's gait, convinced Miller that McCambridge was in a satisfactory condition to drive.

Next, Miller asked McCambridge if he could look into the car. McCambridge said no and after some further discussion told Miller to get a search warrant. At that point, Miller became even more suspicious and advised McCambridge that he was under arrest. Miller testified that the charges were following too closely, expired operator's license, and failure to yield right of way for an emergency vehicle.[1] A pat-down search disclosed a box of shotgun shells but no weapons. McCambridge was handcuffed and placed in the rear of the police car.

Returning to the car McCambridge had been driving, Miller approached from the passenger side "[t]o obtain positive identification of the vehicle pursuant to impounding." At this point, he testified that he saw an inch or two of the end of the barrel of a sawed-off shotgun which was wrapped in a coat, partly under the front seat. Miller removed the weapon then went to the other side of the car to check for the vehicle identification number (VIN) which he found was gone. Under Washington law, a vehicle with a missing VIN:

"shall be impounded and held by the seizing law enforcement agency until the original number or marks are restored, or it is determined that the motor vehicle . . . was reported as stolen and it is returned to the rightful owner as provided in this subsection."

Wash.Rev.Code § 9.54.030(2). Miller removed everything in the vehicle that was in plain sight and that appeared to belong to McCambridge, including the envelope on the front seat, clothing, several sacks of food and a black suitcase. Miller looked through the envelope but did not search the suitcase at that time. All of the items were placed in the police car to be taken to the station.

The sheriff filled out an impound sheet on the car and after a wrecker towed it away to a security bunker, he took McCambridge to the courthouse for booking, then returned to the police station with the items removed from the car. There the contents of the suitcase were inventoried. A search warrant was obtained at a later time for a thorough search of the automobile. The contents of the suitcase, the suitcase itself, and papers from the envelope were ultimately introduced at trial.

After the hearing on the motion to suppress during which Deputy Sheriff Miller as well as the defendant testified, the district court on January 23, 1976, made the following ruling and findings on the motion to suppress:

"This motion is allowed with respect to the contents of the suitcase found in the defendant's vehicle and is otherwise denied. I find the arrest to have been for the purpose of justifying a search, but that there was probable cause for searching the vehicle independent of the purported arrest. Memorandum to follow."

The court never issued a memorandum but on January 26, 1976, altered its original order as follows:

"After rehearing, and after review of the Court Reporter's notes, I find as a fact

---

1. McCambridge testified at the hearing that the sheriff did not notice the expired license until he arrested McCambridge and took him to the station house. The court made no finding as to whose version it accepted.

that the 'inventory search' of defendant's suitcase was in connection with the valid impoundment of the vehicle rather than the invalid arrest of the defendant. Accordingly, I rescind the order of 1–23–76 and deny the motion in its entirety."

■ On appeal, the Government argues that the arrest was valid and that the search was for probable cause. We agree that the arrest was valid. Why the district court referred to the arrest itself as "invalid" is not clear. Presumably it had in mind its earlier finding that the arrest ·was for "the purpose of justifying a search". But while we do not say that there could never be an egregious situation where an arrest on purely colorable grounds might be held invalid as "pretextual", cf. *Taglavore v. United States*, 291 F.2d 262, 265 (9th Cir. 1961), the validity of an arrest is normally gauged by an objective standard rather than by inquiry into the officer's presumed motives. If this were not so, an arrest's validity could not be settled until long after the event; it would depend not only on the psychology of the arresting officer but the psychology of the judge. *Cf. United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Here Sheriff Miller was authorized to arrest McCambridge under Washington law which empowers arrests "for any violation of the traffic laws or regulations which is punishable as a misdemeanor" committed in an officer's presence. Wash.Rev.Code § 46.64.015. Violation of most motor vehicle laws, including following too closely, are misdemeanors. *See* Wash.Rev.Code §§ 46.61.010, 46.61.145. There is no evidence that the initial stop was pretextual, the sheriff having just stopped another driver for following too closely. McCambridge's suspicious movements before stopping, *see Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), the presence of alcohol and the out-of-date temporary license, were objective grounds for treating McCambridge differently from the average traffic offender who can be expected to respond to a citation.

■ Having arrested the driver, the sheriff was entitled to enter and secure the vehicle which, left by itself on the highway, would be subject to vandalism and might threaten "public safety and convenience." *See South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The sheriff thus came properly in position to see the sawed-off shotgun in plain view and seize it as contraband, *see Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. Cepulonis*, 530 F.2d 238, 243 (1st Cir. 1976), and he was also entitled to check for the VIN, *see United States v. Graham*, 391 F.2d 439, 443 (6th Cir.), *cert. denied*, 393 U.S. 941, 89 S.Ct. 307, 21 L.Ed.2d 278 (1968). Discovery that the VIN was missing placed the sheriff under an express duty under state law to impound the vehicle, Wash. Rev.Code § 9.54.030(2). It also gave rise to a logical inference that the car was stolen. There was both a right to impound the car and inventory the contents, *see South Dakota v. Opperman, supra*, 428 U.S. at 375, 96 S.Ct. 3092; *see also United States v. Friesen*, 545 F.2d 672 (9th Cir. 1976), and—given probable cause to suspect that the vehicle, with its unlicensed driver and sawed-off shotgun, was stolen—a concurrent right to search as well. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The inventory and search properly encompassed the vehicle's contents, including the stolen suitcase which did not, in fact, belong to McCambridge.[2] *See Bertucci v. United States*, 532 F.2d 1144, 1145–46 (7th Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *United States v. Tra-*

---

2. It is hard to see on what basis McCambridge has standing to challenge the search of the suitcase since, having been in wrongful possession, he can claim no ownership interest or other right to it. *Cf. Jones v. United States*, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Kucinich*, 404 F.2d 262, 266 (6th Cir. 1968); *United States v. Ko-*

*nigsberg*, 336 F.2d 844, 847 (3d Cir.), *cert. denied*, 379 U.S. 933, 85 S.Ct. 334, 13 L.Ed.2d 344 (1964). Moreover, given probable cause to believe that the vehicle itself was stolen, it was reasonable for the police to search luggage found therein for clues to the vehicle's true owner. *See generally Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

*munti,* 513 F.2d 1087, 1104–05 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Soriano,* 497 F.2d 147, 149 (5th Cir. 1974). That the suitcase was not searched until it was taken to the police station does not change the result. *See Texas v. White, supra,* 423 U.S. at 68, 96 S.Ct. 304.

We affirm the denial of the motion to suppress.

b. *Fairness of the Trial*

 McCambridge asserts that the trial was unfair because the aiding and abetting theory was introduced only in final argument. He also claims that the indictment charged only the substantive offense. However, the indictment cited 18 U.S.C. § 2. It is well settled that even though a defendant is indicted solely for commission of a substantive offense, he may be convicted as an aider and abettor even if not designated as such in the indictment. *E. g., United States v. Pellegrino,* 470 F.2d 1205, 1209 (2d Cir. 1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973); *United States v. Thomas,* 469 F.2d 145, 146 n. 3 (8th Cir. 1972), *cert. denied,* 410 U.S. 957, 93 S.Ct. 1429, 35 L.Ed.2d 690 (1973); *United States v. Harvey,* 439 F.2d 142, 143 (3d Cir.), *cert. denied,* 403 U.S. 934, 91 S.Ct. 2264, 29 L.Ed.2d 713 (1971); *Levine v. United States,* 430 F.2d 641, 643 (7th Cir. 1970), *cert. denied,* 401 U.S. 949, 91 S.Ct. 962, 28 L.Ed.2d 232 (1971); *United States v. Trollinger,* 415 F.2d 527, 528–29 (5th Cir. 1969); *United States v. Duke,* 409 F.2d 669, 671 (4th Cir. 1969), *cert. denied,* 397 U.S. 1062, 90 S.Ct. 1497, 25 L.Ed.2d 683 (1970). We therefore find no merit in these arguments.

c. *Sufficiency of the Evidence*

 There was ample evidence from which a jury could find that McCambridge aided and abetted in the commission of the attempted robbery. Viewed in the light most favorable to the Government, *see United States v. Doran,* 483 F.2d 369, 372 (1st Cir. 1973), *cert. denied,* 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974), a jury could conclude from the evidence: 1) that

McCambridge, using an alias, bought the Plymouth with the purpose of acquiring a set of New Hampshire plates; 2) that he was knowingly involved with the theft of the getaway car on March 17, his plates and fingerprints being found thereon the next day and a suitcase and papers taken from the stolen car being found in McCambridge's possession three weeks later; 3) that sometime between roughly 11 p. m. on March 17 and early morning of the next day when the robbery was attempted, McCambridge either placed his New Hampshire plates on the car that was used in the crime or allowed them to be placed on the car; 4) that McCambridge was in the getaway car at some time himself, having left his prints on the mirror and on a bottle found therein; and 5) that McCambridge fled the jurisdiction under his assumed name three days after the aborted robbery. The purposive acts of acquiring the New Hampshire plates less than a week before the robbery attempt and transferring them to the getaway car, and the indisputable link between McCambridge and the car used in the crime—a link that was also proximate in time—support a fair inference that McCambridge associated himself with the robbery venture, that he participated in it as something he wished to bring about and that he sought to make the venture succeed by his actions. *See United States v. Martinez,* 479 F.2d 824, 829 (1st Cir. 1973), *citing United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.).

The motions for acquittal and for a new trial based on the insufficiency of the evidence were properly denied.

d. *The Jury Instructions*

Defendant claims that the instructions to the jury were impermissibly imprecise, especially on the element of specific intent. *See United States v. Garguilo,* 310 F.2d 249, 254 (2d Cir. 1962) (Friendly, J.). He also argues that the instructions were too general in that they would have allowed the jury to convict on any of three different grounds: 1) that the defendant went into the bank; 2) that the defendant was

present at the scene, presumably as the getaway driver; 3) that the defendant, while not present, aided and abetted the attempted armed robbery.

■ The lack of an objection under Fed.R.Crim.P. 51 is fatal to these contentions. The instructions were legally correct and substantially in accordance with those requested by both sides; and while they might have been improved or clarified in some particulars, there was no "plain error" such as would justify reversal in the absence of objection. *See* Fed.R.Crim.P. 52(b).

e. *Failure to Exclude Jurors*

■ McCambridge argues that the court erred in failing to grant a pre-trial written motion to exclude from sitting "potential jurors" who were present in the courtroom the previous day (January 12, 1976). In an attached affidavit, defense counsel stated that on that day he had said to the judge, when discussing trial date, "When I visited my client at Walpole he suggested . ." before being informed by government counsel that there were present jurors who might be sitting on the defendant's case. This motion was never acted on, and it is significant that the same experienced and vigorous counsel who made the motion and affidavit concerning the January 12 incident did not refer to the matter in the jury voir dire questions which he proposed on January 23 nor is there any indication that he objected to the seating of any juror or pressed the motion in any respect. The trial commenced January 26. With nothing to indicate that at anyone who had been present on January 12 was a juror in McCambridge's trial or, indeed, that potential jurors had actually been present or overheard or understood the attorney's remark, we do not accept the mere existence in the case file of the unacted-upon motion as indicative of any error. It seems only reasonable to assume that the concerns which led counsel to file the motion were dissipated in light of later events, and that the motion was abandoned.

f. *Codefendant's Guilty Plea*

■ After the second day of trial, the codefendant, Venere, pleaded guilty out of the presence of the jury. The court subsequently instructed the jury that they were not to speculate about the reduction in the number of defendants in the case and to go forward considering the case of McCambridge as though he had always been the only defendant. As the record disclosed no motion for a mistrial, McCambridge apparently claims on appeal that a mistrial should have been granted, *sua sponte*. He relies on *Rogers v. United States*, 304 F.2d 520 (5th Cir. 1962) for the bald assertion that when a codefendant pleads guilty during a trial a mistrial must be declared against the other defendant. But in *Rogers* a motion for a mistrial was made and the basis for the court of appeals' decision was that the defendants should not have been joined in the first place. Whatever the merits of *Rogers,* we do not have that kind of situation here. Even if a motion had been made, McCambridge would not have been entitled to a mistrial on this record.

II. *The Second Appeal*

When McCambridge's case came on for disposition, he was allowed to make a statement in allocution. During this lengthy statement, he mentioned that he had wanted to take the witness stand at trial but that his lawyer had advised him not to because his criminal record would have almost certainly been used against him. The court, which had not been asked during the trial to rule on the admissibility of the defendant's record, indicated in response to this revelation that it might grant defendant a new trial. The Government objected that a motion for a new trial would be untimely and that, in any event, a hearing should be held on the question. The court then set a date for a hearing on any motion for a new trial that the defendant might wish to file. At that hearing, the court denied defendant's motion for want of jurisdiction because it was not based on "newly discovered evidence" as required when such a motion is not filed within seven days of the verdict. Fed.R.Crim.P. 33. A fif-

teen year sentence was imposed and the defendant filed the appeal discussed in Part I above.

After the initial appeal to this court was on file, McCambridge moved again in the district court for a new trial, contending that alleged incompetence of counsel in discouraging McCambridge from taking the stand constituted "newly discovered evidence". Although the Government argued that incompetence of counsel could be raised only by way of a motion pursuant to 28 U.S.C. § 2255, the court decided to hear any evidence defendant wished to present on the issue of incompetent counsel. Defendant, now proceeding *pro se,* but with his former counsel present and apparently endeavoring to be helpful, called two witnesses who testified to the effect that McCambridge himself made the decision not to testify because of his concern that his prior record would be used against him. McCambridge then called his trial counsel, Mr. Zalkind, as a witness and questioned him about conversations that the two of them had had on the subject of the use of prior convictions to impeach if McCambridge should take the stand. McCambridge objected, however, to the Government's later effort to cross-examine Zalkind about his entire advice to McCambridge concerning taking the stand. The court ruled that the whole conversation as it had bearing on the defendant's decision not to testify would come in unless the defendant withdrew his motion. After some further discussion, McCambridge withdrew his motion. An appeal to this court alleging that he was coerced into withdrawing the motion was denied for want of jurisdiction. McCambridge then requested the district court to reopen his motion for a new trial which was treated by the court as a motion for rehearing and denied on June 9, 1976. It is from that denial that McCambridge now appeals.

The District of Columbia Circuit has held in recent cases that alleged ineffectiveness of counsel resulting in dereliction of constitutional dimension may constitute "newly discovered evidence" for the purpose of a Rule 33 motion for a new trial. *See United States v. Tindle,* 173 U.S.App.D.C. 77, 522 F.2d 689, 692 n. 8 (1975); *United States v. Brown,* 155 U.S.App.D.C. 177, 476 F.2d 933, 935 n. 11 (1973).

Assuming *arguendo* that this may be so, the district court was nonetheless correct in terminating the new trial hearing in light of McCambridge's refusal to accept its ruling that Zalkind had to testify concerning his entire advice on taking the stand. After preliminary questioning, McCambridge asked Zalkind,

"On that subject, Mr. Zalkind, on the subject of the use of my prior convictions, on the subject of my prior convictions being placed in evidence by the attorney for the government for impeachment purposes, if I took the witness stand, would you tell the court now what you told me on that subject?"

By asking Zalkind about a privileged communication, McCambridge waived his privilege "as to all consultations relating to the same subject." McCormick on Evidence § 93 at 195 (2d ed. 1972). McCambridge would like to narrow the waiver to advice on the use of prior convictions, and keep out other reasons that were discussed concerning whether or not it was advisable for him to testify. But the subject cannot be so finely circumscribed. The court ruled that the whole conversation would come in "insofar as it has anything to do with your taking the stand". This was only reasonable in order for the court to assess the role of the prior conviction advice in McCambridge's decision not to testify. Without inquiring into all facts,[3] the court could not

**3.** McCambridge intimates on appeal that had he testified he would have explained to the jury that he had assumed the name "O'Donnell", his mother's maiden name, as an escaped convict to establish a new identity. This testimony, he argues, would have explained away certain incriminating circumstantial evidence. But it also would seemingly have disclosed a criminal background apart from the introduction of prior convictions for impeachment. Obviously

assess the overall soundness of Zalkind's counsel, nor the impact of any part of it on McCambridge's decision to remain silent. In addition, the court could not determine whether an acquittal would likely have resulted had McCambridge testified, a question relevant when passing upon a new trial motion. The Government's last question was,

"Now you did discuss with him, prior to his or about the same time that he told you he was reserving his decision, did you discuss with him the reasons [objection] why he should or should not take the stand?"

The question, which was never answered because McCambridge withdrew his motion when the judge overruled his objection, was within the waiver of the privilege and was relevant.

The court could have pressed for an answer but was entitled to allow McCambridge to withdraw the motion and discontinue the hearing in light of his unreadiness to accept a correct ruling that was adverse to him. The denial of the motion for a rehearing is affirmed.

*Affirmed.*

the substantiality of his claim to have been prejudicially misled by counsel could only have been answered if counsel's complete advice and all other relevant considerations were placed before the court.