UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1804

DANIEL J. ROCHE ET UX. VALERIE ROCHE,

Plaintiffs, Appellants,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge] 



Before

Selya, Boudin and Lynch,

Circuit Judges. 



Robert E. Kelley, with whom Robert W. Kelley was on brief, 
for appellants.
Neil Jacobs, with whom Michael J. Moody and Hale and Dorr 
were on brief, for appellee.



April 16, 1996



SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. 

consider whether a private party should be held liable under 42

U.S.C. 1983 for an arrest and unsuccessful prosecution that

followed on the heels of its detailed report of suspected

wrongdoing to the authorities. The district court found no

competent evidence that the defendant violated 1983, discerned

no merit in the plaintiffs' other claims, and granted brevis 

disposition. See Fed. R. Civ. P. 56. Descrying no error, we 

affirm.

I. I. 

Background Background 

We limn the facts in the light most hospitable to the

summary judgment loser, consistent with record support. See, 

e.g., Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 

1990). In so doing, we ignore "conclusory allegations,

improbable inferences, and unsupported speculation." Medina- 

Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 

1990).

On March 18, 1991, as part of a sizeable reduction in

force, defendant-appellee John Hancock Mutual Life Insurance

Company (Hancock) laid off approximately 450 workers including

plaintiff-appellant Daniel J. Roche. The next day the principal

architect of Hancock's downsizing (a senior executive vice-

president who, for the sake of anonymity, we shall call "Green")

received three electronically recorded telephone messages on his

office voice mail system. The speaker threatened Green's life

2

and forecast the imminent kidnapping and mutilation of his

children. Later that day Green's secretary received and recorded

an equally ominous call.

Richard Louis, a Hancock employee responsible for

internal investigations, prepared recordings of the menacing

messages. It was readily apparent that these anonymous calls

were made by a man endeavoring to disguise his voice. Louis

tentatively concluded that the mystery man was a casualty of the

recent reduction in force, reported the matter to the Boston

police, and took steps to ensure the safety of Green and his

family. When the police investigation fizzled, Hancock retained

a firm of private detectives (McCain & Fitzpatrick). Robert

Fitzpatrick spearheaded the probe. After a preliminary review,

Fitzpatrick agreed that a disgruntled ex-employee most likely had

made the calls and predicted that the miscreant would strike

again around the anniversary of the March 18 layoffs.

All was quiet until the day before Christmas when Green

received another anonymous call. This call was sarcastic but not

threatening. He received a second such call eight days later. 

Louis played recordings of these two calls for his supervisor,

David Cullington, who thought that the voice belonged to Jack

Budrow (an employee who had lost his job in the March layoffs). 

Fitzpatrick's attempts to correlate these calls with the four

original calls proved inconclusive, and Hancock discounted Budrow

as a suspect vis-a-vis the threats.

In February of 1992, Hancock rehired Roche. On March

3

13, Green received another anonymous voice mail message. This

time the caller promised to kill him on the layoff anniversary

date. Louis recorded the communique and notified the

authorities. Cullington, understandably alarmed, played the

recording for Neil Smith (a manager acquainted with many of the

employees who had been cashiered in March 1991). Smith had known

Roche for twenty-two years and thought that he recognized Roche's

voice. Cullington next played the four March 1991 messages for

Smith's listening pleasure, but Smith could not positively

identify the caller.

Without mentioning Smith's views, Cullington aired the

same five messages for Paul Heaslip, Hancock's director of labor

relations, who had worked with Roche for four years. Heaslip

said that he recognized Roche's voice on the anniversary message,

but that he could not identify the disguised voice featured in

the four earlier recordings. Without mentioning Roche's name,

Cullington consulted Barry Rubenstein, Hancock's in-house

counsel. Rubenstein had worked with Roche off and on from 1985

to 1989. When he heard the same quintet of messages he

volunteered that the voice on the latest recording belonged to

Roche.

At that juncture, Rubenstein assumed an active role in

the proceedings. He researched the law, informed Cullington that

the threatening calls probably violated federal and state

criminal prohibitions, and stated that it would be appropriate to

report Hancock's suspicions to the authorities. Rubenstein also

4

counselled Cullington that, under the terms of the applicable

collective bargaining agreement, Roche's employment could be

terminated. Out of an abundance of caution, Rubenstein suggested

that the company obtain yet another opinion. Following this

advice, Cullington auditioned the recordings for Brooks Tingle 

an employee who was in regular contact with Roche but not privy

to the investigation. Tingle stated without prompting that both

the March 1991 and March 1992 recordings contained Roche's voice.

In the same time frame Fitzpatrick, acting for Hancock,

recruited Sensimetric, a voice analysis firm, to compare the

March 1991 and March 1992 messages in order to determine whether

the calls had been made by the same person. Fitzpatrick reported

to Hancock that Sensimetric's analysis "strongly indicate[d]

that the same individual may have made both recordings." 

Fitzpatrick also asked Sensimetric to compare the non-threatening

messages attributed to Budrow with the threat made in March of

1992. Sensimetric's analysis failed to establish a likely tie. 

On March 23, 1992, Hancock lawfully but surreptitiously obtained

a recorded specimen of Roche's normal speaking voice. 

Fitzpatrick subsequently reported to Hancock that, based on

Sensimetric's examination of the sample, Roche's voiceprint

matched that of the minacious caller.

Armed with this information, Louis recontacted the

authorities. A law enforcement official requested that he secure

sworn affidavits from the individuals who claimed to be able to

identify Roche's voice. Louis followed instructions and, on

5

March 25, he met with representatives of the Boston Police

Department and the Suffolk County District Attorney's Office. 

Louis played the five threatening messages and presented sworn

affidavits from Smith, Heaslip, Rubenstein, and Tingle confirming

that each had identified Roche as the perpetrator. Relying on

Fitzpatrick's reports, Louis also told the authorities that

Sensimetric had analyzed the recordings and had concluded that

the caller's speech matched Roche's normal speaking voice.

The police decided to pursue the case. Without the

participation of any Hancock representative, the officers applied

for a criminal complaint and procured an arrest warrant. The

next morning four police officers arrived by prearrangement at

the company's Braintree office. Louis joined them and summoned

Roche. After Louis handed Roche a termination letter, the

gendarmes arrested him and, in short order, the district attorney

charged him with threatening to murder Green, threatening harm to

Green's family, and making harassing telephone calls.

Hancock kept close track of the criminal case: it

acceded to various prosecution requests for information, paid

Sensimetric's expert witness fees, and in addition, several of

its employees (including Louis, Heaslip, and Tingle) testified at

the trial. Notwithstanding Hancock's cheerleading, the jury

voted to acquit.

II. II. 

Travel of the Case Travel of the Case 

6

Roche sued Hancock in a Massachusetts state court.1 

He asserted claims for abridgement of his civil rights pursuant

to 42 U.S.C. 1983 and counterpart state statutes. He also

pleaded claims for false arrest, false imprisonment, abuse of

process, malicious prosecution, and wrongful discharge. Hancock

removed the suit to the federal district court citing federal

question jurisdiction. See 28 U.S.C. 1331, 1441. 

After the close of discovery, Hancock sought summary

judgment. The district court, ruling ore tenus, found that 

Hancock, as a matter of law, had probable cause to believe that

the appellant had committed or would commit a crime, and thus had

legal justification to report the information in its possession

to the police. On this basis, the court rejected the appellant's

civil rights, abuse of process, and malicious prosecution claims. 

Finding his other claims to be equally lacking in merit, albeit

for different reasons, the court granted judgment in Hancock's

favor across the board. This appeal followed.

III. III. 

Analysis Analysis 

A. A. 

The Summary Judgment Standard The Summary Judgment Standard 

We afford plenary review to the entry of summary
 

1Roche's wife, Valerie, joined him as a party plaintiff and
appears as an appellant in this venue. Since her claims (for
infliction of emotional distress and loss of consortium) are
entirely derivative of his, we discuss the case as if Daniel
Roche were the sole plaintiff and appellant. Of course, our
reasoning and result are fully applicable to Valerie Roche's
claims.

7

judgment on the civil rights claim. See Smith v. F.W. Morse & 

Co., 76 F.3d 413, 428 (1st Cir. 1996). The criteria are 

familiar: a court may grant summary judgment if the nisi prius

roll discloses no genuine issue of material fact and if, viewing

the entire record in the light most flattering to the nonmovant,

the proponent demonstrates its entitlement to judgment as a

matter of law. See McCarthy v. Northwest Airlines, Inc., 56 F.3d 

313, 315 (1st Cir. 1995) (collecting cases); see also Fed. R. 

Civ. P. 56(c).

In applying these criteria, we recognize that

"genuineness and materiality are not infinitely elastic

euphemisms that may be stretched to fit whatever pererrations

catch a litigant's fancy." Blackie v. Maine, 75 F.3d 716, 721 

(1st Cir. 1996). An issue is "genuine" only when the relevant

evidence could lead a reasonable factfinder, drawing favorable

inferences, to decide it in the manner described by the nonmoving

party; a fact is "material" only when it possesses the capacity,

if determined as the nonmovant wishes, to alter the outcome of

the lawsuit under the applicable legal tenets. See id. In this 

connection, it is important to remember that genuine disputes

over material facts can only sprout out of competent and

reasonably definite evidence actually contained in the summary

judgment record. See Garside, 895 F.2d at 50. Put bluntly, 

"motions for summary judgment must be decided on the record as it

stands, not on a litigant's visions of what the facts might some

day reveal." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 

8

581 (1st Cir. 1994). Thus, speculation and surmise, even when

coupled with effervescent optimism that something definite will

materialize further down the line, are impuissant in the face of

a properly documented summary judgment motion. See Dow v. United 

Bhd. of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993). 

B. B. 

The 1983 Claim The 1983 Claim 

The court below entered judgment on the 1983 claim

based on its determination that Hancock had legal justification

to report the appellant to the police and procure his arrest. 

Since 1983 is aimed at state action and state actors, see 42 

U.S.C. 1983 (providing private right of action for deprivations

of constitutional rights "under color of any statute, ordinance,

regulation, custom, or usage" of any state), persons victimized

by the tortious conduct of private parties must ordinarily

explore other avenues of redress. See Dennis v. Sparks, 449 U.S. 

24, 27-28 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 

(1970). To be sure, the rule is not absolute: private actors

may align themselves so closely with either state action or state

actors that the undertow pulls them inexorably into the grasp of

1983. See, e.g., Adickes, 398 U.S. at 152; Burton v. 

Wilmington Parking Auth., 365 U.S. 715, 724 (1961). But the case 

at hand exemplifies the general rule, not the exception to it.

Here, the undisputed evidence discloses that the

police, of their own volition, decided to seek an arrest warrant. 

An independent magistrate then examined the collected evidence

9

and found it sufficient to justify issuance of the warrant. 

There is not the smallest hint that the magistrate was a Hancock

pawn, or, for that matter, that Hancock solicited the magistrate

to act. From that point forward, the police dictated the time,

place, and manner of the arrest; the district attorney's office

framed the charges; and that office directed the ensuing

prosecution. Because (1) the officers who requested the warrant

independently exercised reasonable professional judgment in

applying for it, cf. Malley v. Briggs, 475 U.S. 335, 345-46 & n.9 

(1986), (2) the magistrate acted autonomously and within the

range of her judicial competence in issuing the warrant, and (3)

the district attorney acted autonomously in prosecuting the case,

there is no principled basis for attributing state action to

Hancock.

Of course, liability under 1983 requires not only

state action but also an unconstitutional deprivation of rights. 

The appellant fares no better on this aspect of the inquiry. At

a bare minimum, if probable cause to arrest and prosecute the

appellant existed, no unconstitutional deprivation occurred.2 
 

2We do not in any way imply that a citizen must have
probable cause (or anything remotely approaching probable cause)
before informing the police of a suspected crime. Indeed, to the
extent that the appellant's thesis implies that a private citizen
who articulates his suspicions to the police may, without more,
be held liable as a state actor under 1983 for an ensuing
arrest and prosecution if probable cause is lacking, we
unequivocally reject it. There is a strong public interest in
encouraging people to bring possible wrongdoing to the
authorities' attention. Consequently, when a private party,
acting in good faith, reports suspected criminal activity to the
police, the cutlass of the federal civil rights statute remains
in its scabbard. See, e.g., Wagenmann v. Adams, 829 F.2d 196, 

10

See Franco de Jerez v. Burgos, 876 F.2d 1038, 1040 (1st Cir. 

1989) (holding that the filing of a criminal complaint does not

violate the Constitution if the prosecutor had probable cause to

believe the defendant had committed the crime); Mann v. Cannon, 

731 F.2d 54, 62 (1st Cir. 1984) (explaining that to prove a

Fourth Amendment violation pursuant to 1983, a "plaintiff must

show at a minimum that the arresting officers acted without

probable cause").

Probable cause to arrest exists if, at the moment of

the arrest, the facts and circumstances within the relevant

actors' knowledge and of which they had reasonably reliable

information were adequate to warrant a prudent person in

believing that the object of his suspicions had perpetrated or

was poised to perpetrate an offense. See Beck v. Ohio, 379 U.S. 

89, 91 (1964); United States v. Figueroa, 818 F.2d 1020, 1023 

(1st Cir. 1987). By definition, the determination does not

require scientific certainty. See Illinois v. Gates, 462 U.S. 

213, 235 (1983).

The inquiry into the existence vel non of probable 

 

210 (1st Cir. 1987) (endorsing the "premise that merely
initiating a good-faith request for police protection would not
attach liability for the subsequent unconstitutional conduct of
arresting officers"); Carey v. Continental Airlines, Inc., 823 
F.2d 1402, 1404 (10th Cir. 1987) (similar; airline employee
contacted police to remove striker from terminal); see also 
Alexis v. McDonald's Restaurants of Mass., Inc., 67 F.3d 341, 
351-52 (1st Cir. 1995) (granting summary judgment for restaurant
manager in analogous circumstances); United States v. Garlock, 19 
F.3d 441, 444 (8th Cir. 1994) (holding that a private employer
who investigated employee misconduct and reported the results did
not automatically become a state actor).

11

cause is not to be undertaken from the perspective of hindsight

but from the perspective of a hypothetical "reasonable man"

standing in the reporting person's shoes at the time when that

person acted. See Figueroa, 818 F.2d at 1023; United States v. 

McCambridge, 551 F.2d 865, 870 (1st Cir. 1977). The preferred 

approach is pragmatic; it focuses on the "factual and practical

considerations of everyday life on which reasonable and prudent

men, not legal technicians, act." Gates, 462 U.S. at 231. Thus, 

the quantity and quality of proof necessary to ground a showing

of probable cause is not the same as the quantity and quality of

proof necessary to convict. See United States v. Hoffman, 832 

F.2d 1299, 1305-06 (1st Cir. 1987); United States v. Miller, 589 

F.2d 1117, 1128 (1st Cir. 1978), cert. denied, 440 U.S. 958 

(1979). It follows that one who asserts the existence of

probable cause is not a guarantor either of the accuracy of the

information upon which he has reasonably relied or of the

ultimate conclusion that he reasonably drew therefrom. See 

Figueroa, 818 F.2d at 1024-25. 

Even assuming that it was Hancock (and not the police)

who asserted the existence of probable cause, Hancock measures up

against this benchmark. Its own staff conducted an extensive

investigation of the threatening messages. That probe ultimately

unearthed a quartet of employees who identified the appellant's

voice. These individuals were all familiar with his speech, and

each vouchsafed the accuracy of the identification. There is no

suggestion in the record that any of these persons had the

12

slightest reason to dissemble. Standing alone, the

identification evidence is sufficient to support a finding of

probable cause.

What is more, the finding of probable cause does not

rest entirely on the identification evidence. Voice analysis

strongly suggested that the same individual originated the calls

placed in March of 1991 and March of 1992, and that the appellant

whose voiceprint matched the voiceprint of the man who placed

the March 1992 call was that individual. To buttress this

conclusion, Hancock received a series of reports from

Fitzpatrick, a twenty-year veteran of the FBI, indicating that

the appellant had placed the calls. On the basis of the

substantial evidence produced by Hancock's investigation, a

reasonable factfinder would have no option but to conclude that

Hancock had probable cause to report its findings to the

police.3

The appellant attempts to undermine this conclusion by

means of several expedients. We find these expedients uniformly

unavailing.

First, the fact that a state court jury acquitted the

appellant of the criminal charges does not speak to the existence

of probable cause. The probable cause determination is made at a

different point in time by a different, less demanding

 

3It should be noted that the incentive to contact the
authorities was great; the caller threatened murder, and Hancock
had every reason to believe that Green's life was in dire
jeopardy.

13

methodology, and requires less proof than a conviction. See 

Figueroa, 818 F.2d at 1023; Miller, 589 F.2d at 1128. 

Second, the appellant's claim that the recordings were

of such poor quality that no one could glean anything useful from

them, even if true in retrospect, begs the question. Roche

points to nothing that furnishes any rational basis for believing

that Hancock, at the time it contacted the police, knew of any 

such shortcoming. This is of decretory significance because, for

the purpose of determining probable cause, courts must ask

whether a reasonable person would rely on a particular piece of

information, not whether that information was unquestionably

accurate.4 See Gates, 462 U.S. at 231. 

Third, the appellant's claim that the voice

identifications were "shaky" because they were performed under

highly suggestive conditions is argumentative. He offers not a

shred of probative evidence to support this asseveration, and it

is flatly contradicted by affidavits and depositions contained in

the record.

Fourth, the appellant asserts that the voice-imprint

analysis performed by Sensimetric failed conclusively to identify

him as the perpetrator. We agree but that fact is largely

beside the relevant point. The record is pellucid that Hancock

based its assessment of the expert's findings on Fitzpatrick's

account, and faithfully reported that account (which tended to
 

4In any event, the magistrate independently examined the
recordings and apparently found them to be of adequate quality to
support the issuance of an arrest warrant.

14

inculpate Roche) to the authorities. If Sensimetric bungled 

and there is little in the record to suggest that it did that

fact was not known to Hancock.

Fifth, the appellant maintains that Louis withheld

certain of Sensimetric's findings that tended to exculpate him

and did not mention the calls attributed to Budrow. This claim 

which amounts to an assertion that Hancock impermissibly edited

what it told the police is bootless. Although Roche was able

to demonstrate some equivocation on Sensimetric's part at the 

criminal trial, there is nothing in the record to show that 

Hancock, which dealt with Sensimetric indirectly (through

Fitzpatrick), knew more than it disclosed at the relevant time.  

Similarly, the second part of the claim conveniently overlooks

the fact that Hancock's investigation implicated Roche, and that

Hancock lacked any cause to make a good-faith report to the

authorities concerning Budrow.

We could continue dissecting the appellant's

asseverations, but it would be pointless to do so. All of them

share the infirmities of the ones we have addressed. The short

of the matter is that, when Hancock went to the police, the

evidence it had in hand provided probable cause to believe that

the appellant had threatened to commit a crime and had made

harassing telephone calls, both of which constitute violations of

Massachusetts law.

C. C. 

Malicious Prosecution Malicious Prosecution 

15

The appellant's allegations of malicious prosecution

cannot salvage his 1983 claim. The law is settled that a

garden-variety claim of malicious prosecution garbed in the

regalia of 1983 must fail. There is no substantive due process

right under the Fourteenth Amendment to be free from malicious

prosecution, see Albright v. Oliver, 114 S. Ct. 807, 810-19 

(1994) (plurality op.); Calero-Colon v. Betancourt-Lebron, 68 

F.3d 1, 3 n.7 (1st Cir. 1995), and the availability of a plainly

adequate remedy under Massachusetts law, see Beecy v. 

Pucciarelli, 441 N.E.2d 1035, 1038-39 (Mass. 1982), defeats the 

possibility of a procedural due process claim here, see Perez- 

Ruiz v. Crespo-Guillen, 25 F.3d 40, 43 (1st Cir. 1994).  

Consequently, the appellant cannot rewardingly predicate his 

1983 claim on malicious prosecution simpliciter.5

D. D. 

The Supplemental Claims The Supplemental Claims 

After appropriately granting summary judgment on the 

1983 claim, the district court proceeded to administer the same

medicine to the appellant on the pendent state-law claims. The

argument is made for the first time on appeal that, because the 

1983 claim furnished the sole underpinning for federal

jurisdiction, the district court at that point should have

 

5Although the Supreme Court left open the possibility that a
malicious prosecution claim might lie under 1983 on the basis
of the Fourth Amendment, see Albright, 114 S. Ct. at 813-14, we 
need not explore this virgin territory. Even assuming the
vitality of such an approach, the existence of probable cause
vitiates any arguable Fourth Amendment claim.

16

remanded the state-law claims to the state court or dismissed

them without prejudice. The argument lacks force.

A federal court exercising jurisdiction over an

asserted federal-question claim must also exercise supplemental

jurisdiction over asserted state-law claims that arise from the

same nucleus of operative facts. See 28 U.S.C. 1367(a) 

(providing that "in any civil action of which the district courts

have original jurisdiction, the district courts shall have

supplemental jurisdiction over all other claims that are so

related to claims in the action within such original jurisdiction

that they form part of the same case or controversy"). Thus, the

court below had jurisdiction over the appellant's pendent state-

law claims once Hancock seasonably removed the action from the

state court.

Still, the appellant argues that the situation changed

after the district court threw out his 1983 claim. That

development, he says, stripped the court of power to exercise

jurisdiction over the remaining state-law claims. We disagree. 

In a federal-question case, the termination of the foundational

federal claim does not divest the district court of power to

exercise supplemental jurisdiction but, rather, sets the stage

for an exercise of the court's informed discretion. See 28 

U.S.C. 1367(c)(3) (authorizing a district court to decline

adjudication of lingering state-law claims after it has dismissed

"all claims over which it has original jurisdiction"). In

deciding whether or not to retain jurisdiction on such an

17

occasion, the trial court must take into account concerns of

comity, judicial economy, convenience, fairness, and the like. 

See Rodriquez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st 

Cir. 1995); Vera-Lozano v. International Broadcasting, 50 F.3d 

67, 70 (1st Cir. 1995); Newman v. Burgin, 930 F.2d 955, 963-64 

(1st Cir. 1991). While dismissal may sometimes be appropriate if

the federal-question claim is eliminated early in the

proceedings, see, e.g., Martinez v. Colon, 54 F.3d 980, 990 (1st 

Cir.), cert. denied, 116 S. Ct. 515 (1995), each case must be 

gauged on its own facts. The preferred approach is pragmatic and

case-specific. Thus, in "an appropriate situation, a federal

court may retain jurisdiction over state-law claims

notwithstanding the early demise of all foundational federal

claims." Rodriguez, 57 F.3d at 1177. 

Here, the district court's resolve to go forward with

the state-law claims fell squarely within the realm of its

discretion. The litigation had matured well beyond its nascent

stages, discovery had closed, the summary judgment record was

complete, the federal and state claims were interconnected, and

powerful interests in both judicial economy and fairness tugged

in favor of retaining jurisdiction. We are bound to conclude on

this record that the district court appropriately exercised its

discretion in retaining jurisdiction over, and disposing of, the

entire compendium of claims in the case.

18

That ends the matter.6 Since the appellant has not

made a particularized argument that the district court decided

the state-law claims erroneously, we need go no further. See 

Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990) 

(explaining "that issues adverted to on appeal in a perfunctory

manner, unaccompanied by some developed argumentation, are deemed

to have been abandoned").

IV. IV. 

Conclusion Conclusion 

We need go no further. For the reasons enumerated

above, we hold that the district court acted lawfully in granting

Hancock's motion for brevis disposition on all claims. 

Affirmed. Affirmed. 

 

6We add in passing that the appellant's argument is
procedurally defaulted as well as substantively infirm. When the
time was right, he never asked the district court to withhold
decision on the state-law claims and to remand them to the state
court. It is settled in this circuit that a litigant who could
have asked the district court for relief fairly thought to be
available, but who chose not to do so, cannot seek that relief
for the first time on appeal. See Thibeault v. Square D Co., 960 
F.2d 239, 243 (1st Cir. 1992); Feinstein v. RTC, 942 F.2d 34, 43- 
44 (1st Cir. 1991).

19